**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LEE D. WEST and LYNN M. WEST | ) | |
| | ) | |
| Plaintiffs, | ) | FILED: APRIL 16, 2008 |
| | ) | 08CV2154 J. N. |
| vs. | ) | JUDGE GETTLEMAN |
| | ) | MAG. JUDGE SCHENKIER |
| COPIAGUE FUNDING CORPORATION, | ) | |
| d/b/a, SOUTH SHORE MORTGAGE | ) | |
| COMPANY; HOMECOMINGS | ) | |
| FINANCIAL NETWORK, INC.; | ) | |
| HOMECOMINGS FINANCIAL, LLC; | ) | |
| AURORA LOAN SERVICES; | ) | |
| BANK OF AMERICA; MORTGAGE | ) | |
| ELECTRONIC SYSTEMS, INC.; and | ) | |
| DOES 1-5, | ) | |
| | ) | **JURY DEMAND** |
| Defendants. | ) | |

**COMPLAINT**

**INTRODUCTION**

1.      Plaintiffs bring this action against a "subprime" mortgage lender, its assignees and a mortgage broker to secure redress for predatory lending practices in violation of the Truth in Lending Act ("TILA") and TILA's implementing regulations; the Illinois Consumer Fraud Act ("ICFA"), 815 ILCS Sect. 505/2, and the Illinois Interest Act, 815 ILCS 205/4(2)(a).

**JURISDICTION AND VENUE**

2.      This Court has subject matter jurisdiction under 28 U.S.C. Sects. 1331 (general federal question), 1337 (interstate commerce), 1367 (supplemental) and 15 U.S.C. Sect. 1601, et seq. ("TILA").

3.      Defendants transact business in the District and are deemed to reside here.

**PARTIES**

4.      Plaintiffs own and reside in a home located at 708 Oakwood Drive, Westmont, Illinois 60559.  They are ordinary consumers.

5.      Defendant Copiague Funding Corporation ("Copiague Funding"), doing business as South Shore Mortgage Company ("South Shore Mortgage"), is a New York corporation with principal offices at 155 South 10th Street, Lindenhurst, NY, 11757.  It does business in Illinois.  Its registered agent and office is located at 200 West Adams Street, Chicago, IL, 60606.  It is engaged in the business of a mortgage broker.

6.      Defendant Homecomings Financial Network, Inc., now known as Homecomings Financial, LLC ("Homecomings"), is a Delaware corporation with principal offices located at 8400 Normandale Lake Boulevard, Suite #250, Minneapolis, MN, 55437.  It does business in Illinois.  Its registered agent and office are Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, IL, 62703.

7.      Homecomings is or was engaged in the business of originating sub-prime residential mortgage loans.  Homecomings originated more than 26 residential mortgage loans in 2006.  Homecomings is also a servicer of subprime residential mortgage loans and recently serviced plaintiffs' loans.  Homecomings is now a subsidiary of GMAC.

8.      Defendant Aurora Loan Services, LLC, doing business as Aurora Loan Services ("Aurora"), is a Delaware corporation with corporate headquarters located at 10350 Park Meadows Drive, Littleton, CO, 80124.  It does business in Illinois.  Its registered agent and office are Illinois Service Corporation Company, 801 Adlai Stevenson Drive, Springfield, IL, 62703.  Aurora is engaged in the business of servicing sub-prime residential mortgage loans.  On information and belief, it is the current servicer of plaintiffs' first-lien mortgage loan.  To the extent Aurora is merely a servicer, it is named as a necessary party only.  Aurora is a subsidiary

of Lehman Brothers, which purchases and holds large pools of subprime residential mortgage loans.

9.     Defendant Bank of America is a nationally chartered bank with corporate headquarters located at 100 North Tryon Street, Charlotte, North Carolina, 28255. It does business in Illinois. Among other things, Bank of America is engaged in the business of servicing sub-prime residential mortgage loans. On information and belief, it is the current servicer of plaintiffs' second-lien mortgage loan. To the extent it is Bank of America is merely a servicer, it is named as a necessary party only.

10.     Defendant Mortgage Electronic Registration Systems, Inc., ("MERS") is a Delaware corporation that does business in Illinois. Its registered agent and office are CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, IL 60604. It is engaged in the business of holding legal title to mortgages, as nominee. It is named as a necessary party only.

11.     The current actual owner(s) of plaintiffs' loans is/are named herein as Does 1-5. Ownership of mortgage loans is not a matter of public record; for plaintiffs' loans, this information is within the exclusive possession and control of defendants. Plaintiffs will identify the current legal and beneficial owner(s) of their loans through discovery and seek leave to join those entities as defendants.

## FACTS

12.     Prior to August 3, 2006, plaintiffs received a phone call out of the blue from Irene Schatz, a Senior Loan Officer with South Shore Mortgage. On information and belief, she was calling from Lindenhurst, New York.

13.     When Schatz phoned plaintiffs, she had somehow already obtained their credit information.  Plaintiffs had not previously and did not subsequently authorize her to pull their credit.  Lee West asked her how she obtained plaintiffs' credit information; she evaded the question.

14.     Schatz was smooth and friendly and took information from plaintiffs over the phone for a loan application.  On information and belief, Schatz typed the information into data fields on a computer to generate plaintiffs' completed loan application.  Plaintiffs never met with Schatz or anyone else to sign a loan application prior to closing.

15.     At the time Schatz called, plaintiffs had a single mortgage loan with an interest rate that was fixed at 4.875% through December, 2008 (Exhibit A).  The monthly principal and interest payment on the loan was $1,164.26 (Exhibit B).

16.     Plaintiffs were interested in obtaining a loan for a modest amount of "cash out" in order to cover medical bills, college expenses for their son and other personal, family and household purposes.  The cash proceeds were used exclusively for these and similar purposes.

17.     Schatz requested from plaintiffs (Exhibit C), and plaintiffs provided, extensive information documenting their income and assets.

18.     Schatz then informed plaintiffs that they were approved for financing.

19.     At all times, Schatz told plaintiffs that the interest rate on their loan was going to be 3% for 36 months.  In fact, she stressed this feature of the loan repeatedly in order to sell it to plaintiffs.  Schatz mentioned that the loan had a negative amortization feature, and plaintiffs expressed concern about it, but Schatz repeatedly reassured them that it would not activate for 36 months and that if they made just one extra payment per year they would avoid any negative amortization.

4

20.    Plaintiffs did not received few preliminary disclosures regarding the terms of the loan, and none of the ones plaintiffs received explained the Option Adjustable Rate Loan ("Option ARM") program Schatz had selected for them or what the amount of the payments would or could be.

21.    Schatz never informed plaintiff that the loan terms would be different than she had described to them orally.

22.    Schatz filled out a Net Benefit statement indicating that plaintiff would receive a lower interest rate and a lower monthly payment (Exhibit D).

23.    Schatz never disclosed that plaintiffs would have a 36-month prepayment penalty or a balloon payment.

24.    Plaintiffs never received any notification of changes in the loan terms that Schatz quoted or promised, as required by Illinois law.

25.    Schatz never explained to plaintiff that they would have two loans, an "80/20" loan from then-Homecomings Financial Network, Inc., in which the second-lien loan had an interest rate of 9.525%.

26.    On September 15, 2008, a closing was held at a title company.  Neither Schatz nor anyone from South Shore Mortgage or Homecomings was present.

27.    The following are documents relating to the larger or first-lien loan:

    a.    a Note (Exhibit E);

    b.    a Mortgage (Exhibit F);

    c.    a HUD-1 Settlement Statement (Exhibit G);

    d.    a different HUD-1 Settlement Statement (Exhibit H);

    e.    a Truth In Lending Disclosure Statement (Exhibit I); and

5

f.    a single federal Notice of Right to Cancel form (Exhibit J).

28.    The larger loan, in the principal amount of $300,000, was a 40-year Option ARM with an interest rate of 3% and an initial payment of $1,073.95 - but only for one month (Exhibit E)!  Thereafter, in November, 2006, the first month for which plaintiffs were responsible for making a payment, the interest rate began increasing.  The interest rate adjusts on a monthly basis and can climb to as high as 9.95%.

29.    The "Option" feature meant that plaintiffs could make (a) the minimum, interest-only payment; (b) a fully amortized payment that would allow them to pay off the loan in 40 years; or (c) a payment that would allow them to pay off the loan in 15 years (Exhibit E).

30.    The minimum payment would not be sufficient to cover any principal payments, with the result that the principal would grow over time, and plaintiffs would owe $345,000 or 115% of the $300,000 principal amount they originally borrowed (Exhibit E).

31.    These complex and financially dangerous features were not explained to plaintiffs at closing or anytime.  Products such as the 40-year Option ARM have traditionally been used as a financial management tool by wealthy and financially sophisticated borrowers.

32.    Two September, 2006 Government Accounting Office Reports on Alternative Mortgage Products, reported that the mortgage lenders and brokers were giving the 40-year Option ARM, with unbalance promotions or advertising and inadequate disclosures, to unsophisticated consumers who could not afford the payment shock associated with it.

33.    Similarly, two October, 2006 Special Reports by Fitch Ratings warned of the higher investment risks associated with 40-year Option ARMs because of payment shock, the loss of home equity due to negative amortization, and higher overall default risk.

34.     The single Notice of Right to Cancel form provided for the larger loan was addressed to Mr. West only.  On information and belief, at the time the loans were originated, Mrs. West held title to the home jointly with her husband.

35.     The following are documents relating to the smaller or second lien loan:

a.   a Note (Exhibit K);

b.   a Mortgage (Exhibit L);

c.   a HUD-1 Settlement Statement (Exhibit M);

d.   a different HUD-1 Settlement Statement (Exhibit N);

e.   a Truth In Lending Disclosure Statement (Exhibit O); and

f.   a single federal Notice of Right to Cancel form (Exhibit P).

36.     The smaller loan, in the principal amount of $15,000, was a 15-year loan with an interest rate of 9.525% (Exhibit K).

37.     The Notice of Right to Cancel form was addressed to Mr. West only.

38.      On information and belief, Schatz inflated plaintiffs' income information on their loan applications in order to make it appear that plaintiffs could afford to make the payments on the loans.

39.     Subsequent to closing, servicing of the larger loan was transferred to defendant Homecomings and later to defendant Aurora.  As servicer, Aurroa claims certain rights in plaintiffs' loan, including the right to receive payments, report to credit bureaus and to initiate or direct the initiation of foreclosure as a means of enforcing payment.  It is, therefore, named as a necessary party.

40.     Servicing of the smaller loan was transferred to Bank of America.  As servicer, Aurora claims certain rights in plaintiffs' loan, including the right to receive payments,

report to credit bureaus and to initiate or direct the initiation of foreclosure as a means of enforcing payment.  It is, therefore, named as a necessary party.

41.    Both mortgages were in favor of defendant MERS.  As nominee, it holds title to plaintiffs' mortgages and is, therefore, a necessary party.

42.    Plaintiffs do not know which entities are the current legal and beneficial owners of their loans.  This information is not a matter of public record.  Therefore, the actual owners are named as Does 1-5, and plaintiffs will join them as parties once they learn their identities through discovery.

## COUNT I – TRUTH IN LENDING ACT – INDIVIDUAL CLAIM

43.    Plaintiffs incorporate paragraphs 1-42.  This count is against Homecomings.  Aurora and Bank of America, as servicers, and MERS, as nominee, are named as necessary parties only.

## RIGHT TO RESCIND

44.    Because the transaction was secured by plaintiffs' home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by 15 U.S.C. Sect. 1635 and 12 C.F.R. Sect. 226.23.  Sect. 226.23 provides:

**(a) Consumer's right to rescind.**

**(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47**

**(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed**

for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.

(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act.  [15 U.S.C. §1635(f)]

(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.

(b) <u>Notice of right to rescind.</u> In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

(1) The retention or acquisition of a security interest in the consumer's principal dwelling.

(2) The consumer's right to rescind the transaction.

(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(4) The effects of rescission, as described in paragraph (d) of this section.

(5) The date the rescission period expires. . . .

(f) <u>Exempt transactions.</u> The right to rescind does not apply to the following:

(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].

(2) A credit plan in which a state agency is a creditor.

## GROUNDS FOR RESCISSION

45.    In connection with the loan, Homecomings failed to provide either plaintiff with the required number of federal Notice of Right to Cancel forms, i.e., two per mortgagor per loan, in violation of 12 C.F.R. Sect. 226.23(b) above.  Plaintiffs received a total of two Notice Right to Cancel forms between them for both loans, one for each loan (as indicated by the loan numbers).  Plaintiffs should have received a total of eight forms.

46.    In addition, Homecomings failed to provide Mrs. West with any Notice of Right to Cancel forms whatsoever.  Both of the forms provided are addressed to Mr. West exclusively.

47.    In the alternative, the two notices provided failed to clearly and conspicuously disclose to Mrs. West, because they are not addressed to her, that she also had a federal right to cancel each loan.

48.    Any one of the three violations alone is sufficient to confer on the affected plaintiff the extended, three-year right to rescind either both loans.

49.    Plaintiffs sent notification to defendants of their intent to rescind the loans (Exhibit Q).

50.    The loans have not been rescinded.

51.    Under 15 U.S.C. Sect. 1641(c), the right to rescind may be exercised against "any assignee."

52.    In addition, 15 U.S.C. Sect. 1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section**

**1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

a.  A judgment voiding plaintiffs' mortgages, capable of recordation in the public records, and binding on defendants;

b.  Refund of all finance charges, as provided by the TILA rescission formula;

c.  Statutory damages for the underlying violations;

d.  Actual damages;

e.  If appropriate, statutory damages for failure to rescind;

f.  Injunctive relief, if necessary;

g.  Attorney's fees, litigation expenses and costs; and

h.  Such other or further relief as the Court deems appropriate.


Respectfully submitted,


s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
and The Social Justice Project,
208 S. LaSalle Street, Suite #1650
Chicago, Illinois  60604
Phone - (312) 345-1004
Fax - (312) 346-3242
al@alhofeldlaw.com

## <u>JURY DEMAND</u>

Plaintiffs demand trial by jury.

<u>s/Al Hofeld, Jr.</u>
Al Hofeld, Jr.

## **NOTICE OF LIEN**

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.


s/Al Hofeld, Jr.
Al Hofeld, Jr.


Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
and The Project for Social Justice, Inc.
208 S. LaSalle Street, Suite #1650
Chicago, Illinois 60604
Phone - (312) 345-1004
Fax – (312) 346-3242
al@alhofeldlaw.com

1

08CV2154      J. N.
JUDGE GETTLEMAN
MAG. JUDGE SCHENKIER

# EXHIBIT A

# FIXED/ADJUSTABLE RATE NOTE
### (LIBOR One-Year Index (As Published In *The Wall Street Journal*)-Rate Caps)

**THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

November 28, 2003                    OAK BROOK                         ILLINOIS
[Date]                                  [City]                         [State]

708 OAKWOOD DRIVE, WESTMONT, ILLINOIS   60559
[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 220,000.00          (this amount is called 'Principal'), plus interest, to the order of Lender. Lender is GUARANTEED RATE, INC.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of          4.8750 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.  PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on February 1, 2004                    .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on January 1, 2034          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 2605 WEST 22ND STREET, SUITE #39
OAK BROOK, ILLINOIS  60523
or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $1,154.26          . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4.  ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of January, 2009          , and the adjustable interest rate I will pay may change on that day every 12th month thereafter.

002001422379                              200312563

**MULTISTATE FIXED/ADJUSTABLE RATE NOTE - WSJ One-Year LIBOR - Single Family - Fannie Mae Uniform Instrument**

-168N (0213)                    Form 3528 6/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 5          Initials: S.D.W.

          L.M.W.

                                                    21957-81

The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Two and One Fourth percentage points ( 2.2500%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 9.8750 % or less than 2.2500 % Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 9.8750 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7.  **BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of Fifteen    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.0000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

8.  **GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9.  **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10. **WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

11. **UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A)  Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.



WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
LEE D. WEST                      -Borrower

_____ (Seal)
LYNN M. WEST                     -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

[Sign Original Only]

002001422379                    200312563                        Form 3820 6/01

@ -19BN (0210)                  Page 6 of 5                        21057-06

# EXHIBIT B

Creditor:

GUARANTEE MORTG., INC.
2808 WEST 22ND STREET, SUITE #38
OAK BROOK, ILLINOIS #0822

Applicant:

Date: NOVEMBER 28, 2003

Loan Number:
00900142297B
200312583

LEE D. WEST
708 OAKWOOD DRIVE
WESTMONT, ILLINOIS 60559

# FEDERAL TRUTH-IN LENDING STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)
*SEE REVERSE FOR EXPLANATION OF THIS FORM*

Check box if applicable:

| ANNUAL PERCENTAGE RATE  The cost of your credit as a yearly rate. | FINANCE CHARGE  The dollar amount the credit will cost you. | Amount Financed  The amount of credit provided to you or on your behalf. | Total of Payments  The amount you will have paid after you have made all payments as scheduled |
|---|---|---|---|
| 4.1590 % | $ 158,783.86 | $ 218,012.98 | $ 378,796.84 |

☐ **REQUIRED DEPOSIT:** The annual percentage rate does not take into account your required deposit.

**PAYMENTS:** Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| | | Monthly Beginning: | | | Monthly Beginning: | | | Monthly Beginning: |
| 83 | 1,184.29 | 2/01/04 | | | | | | |
| 299 | 1,025.14 | 2/01/09 | | | | | | |
| 1 | 1,025.38 | 1/01/34 | | | | | | |

☐ **DEMAND FEATURE:** This obligation has a demand feature.

☒ **VARIABLE RATE:** This loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.
THE CURRENT INDEX USED FOR THIS CALCULATION IS 1.3600 %

**INSURANCE:** The following insurance is required to obtain credit:
☐ Credit Life insurance and credit disability  ☒ Property Insurance  ☐ Flood Insurance  ☐ Mortgage Insurance

You may obtain the insurance from anyone you want that is acceptable to the creditor.
☐ If you purchase ☐ property ☐ flood insurance from creditor you will pay $ _____ for a one year term.

**SECURITY:** You are giving a security interest in:
☐ The goods or property being purchased  ☒ Real property you already own.

**FILING FEES:** $

**LATE CHARGE:** If a payment is more than 15 days late, you will be charged 5.0000 % of the principal and interest past due.

**PREPAYMENT:** If you pay off early, you
☐ may ☒ will not  have to pay a penalty.
☐ may ☒ will not  be entitled to a refund of part of the finance charge.

**ASSUMPTION:** Someone buying your property
☐ may ☒ may, subject to conditions ☐ may not  assume the remainder of your loan on the original terms.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.

* means an estimate.  ☐ all dates and numerical disclosures except the late payment disclosures are estimates.

The undersigned acknowledge receiving and reading a completed copy of this disclosure.
Neither you nor the creditor previously has become obligated to make or accept this loan, nor is any such obligation made by the delivery or signing of this disclosure.

_Lee D. West_                    11/28/03
LEE D. WEST                      (Date)

_Lynn M. West_                   11/28/03
LYNN M. WEST                     (Date)

_____        _____
                                 (Date)

NOTE: Payments shown above do not include reserve deposits for taxes, assessments, and property or flood insurance.

Rev. 03/99   DPS 12772

# EXHIBIT C



INBOX: lynn.west

INBOX: Email 1 of 229   Move to Folder                    Next »

**From:** "Irene Schatz" <ischatz@myfastmortgage.com>
[ADD TO ADDRESS BOOK]
**To:** <LYNN.WEST@COMCAST.NET>
**Subject:** FW: SOUTH SHORE MORTGAGE
**Date:** Monday, August 07, 2006 4:32:49 PM                    [VIEW SOURCE]

---

**From:** Irene Schatz
**Sent:** Thursday, August 03, 2006 5:09 PM
**To:** 'LYNN.WEST@COMCAST.NET'
**Subject:** FW: SOUTH SHORE MORTGAGE

---

**From:** Irene Schatz
**Sent:** Thursday, August 03, 2006 4:40 PM
**To:** 'remaxdwt@comcast.net'; 'REMAXLW@COMCAST.NET'
**Subject:** SOUTH SHORE MORTGAGE

**Hello Lee & Lynn West;**

The following is a list of the documentation I need from you.

Everything can be faxed to me at 631-574-1450, or expedited to me in the prepaid DHL overnight envelope I have included in the forthcoming package.

1.) Please provide a copy of your most recent mortgage statement. (For both loans)

2.) Please provide a copy of your unexpired driver's license(s).

3.) Please provide the declaration page (1st page) of your Home Owners Insurance.

4.) CPA (Certified Public Accountant's) Letter stating the type and length of self-employment.

5.) Proof of the stocks (For Assets)

. of 2

6.) 2 Months bank statements (complete)

The opening package was sent out today. The documentation that needs to be signed will be enclosed with the package. Please sign any enclosed forms and forward back to our office in the provided self addressed stamped envelope, or you can fax them directly to me.

Also, in the forthcoming package via mail, there will be a coupon in there for $250 off closing fees if you get the documents back to us within 72 hours from the time you receive the opening package. Enclosed with the DHL package is a pre paid envelope so you can send all the documents back to us or fax them to me.

Thank you and feel free to contact me with any questions or concerns you may have.

Irene Schatz;

Senior Loan Officer
South Shore Mortgage
155 South 10th Street
Lindenhurst, Ny 11757
Phone # 1-631-956-0711 ext. 285
Toll Free # 1-866-237-7452
Fax Line # 1-631-574-1450
www.myfastmortgage.com

THIS E-MAIL MESSAGE AND ANY FILES TRANSMITTED HEREWITH, ARE INTENDED SOLELY FOR THE USE OF THE INDIVIDUAL(S) ADDRESSED AND MAY CONTAIN CONFIDENTIAL, PROPRIETARY OR PRIVILEGED INFORMATION. IF YOU ARE NOT THE ADDRESSEE INDICATED IN THIS MESSAGE (OR RESPONSIBLE FOR DELIVERY OF THIS MESSAGE TO SUCH PERSON) YOU MAY NOT REVIEW, USE, DISCLOSE OR DISTRIBUTE THIS MESSAGE OR ANY FILES TRANSMITTED HEREWITH. IF YOU RECEIVE THIS MESSAGE IN ERROR, PLEASE CONTACT THE SENDER BY REPLY E-MAIL AND DELETE THIS MESSAGE AND ALL COPIES OF IT FROM YOUR SYSTEM.



(Attachments successfully scanned for viruses.)

**Attachment 1: WEST – MEXP.pdf** (application/octet-stream)

INBOX: Email 1 of 229    Move to Folder                    Next »

© 2006 Comcast Cable Communications, Inc. All rights reserved
Privacy Statement  Terms of Service  Contact Comcast

Comcast

# EXHIBIT D

### Reasonable Tangible Net Benefit Statement
*To be obtained on refinance and second lien transactions, when applicable.*

Borrower Name(s): *Lee West and Lynn West*

Property Address: *708 Oakwood Drive Westmont, IL 60559*

Lender: *Homecomings Financial Network, Inc.*

Loan Number: *047-024-7399-6*   Date: *8/11/06*

I/We plan to enter into a transaction which will refinance one or more existing mortgage loan(s) with a new mortgage loan secured by my home as detailed above.

I/We understand the following:

1. there are costs associated with my/our new loan, and my/our new loan will have different terms (including duration) than any/our existing loan(s);
2. under state law, the Lender wants to make sure that I/we have determined that my new mortgage loan will provide reasonable, tangible net benefit to me/us after taking into account the terms of both the new and existing loans, the cost of the new loan, and my/our own personal circumstances;
3. the Lender is making this mortgage loan to me/us in reliance upon the representations made in this Tangible Benefit Statement and each other Lender, investor and servicer who may acquire any interest in this new Mortgage Loan at any time is entitled to rely on this Tangible Benefit Statement.

Borrower(s) acknowledge the following tangible benefit(s) from the new loan (please check every benefit that applies):

✓  I/We will obtain a lower interest rate.

✓  I/We will obtain a lower monthly payment.

_____  I/We will obtain a shorter loan term (e.g. from a 30-year term to a 15-year term)

_____  I/We will consolidate other loans and debts that I have into a single new loan.

_____  I/We will obtain the certainty of a fixed rate of interest.

_____  I/We will be able to make the balloon payment on my existing loan.

_____  I/We will avoid foreclosure of or be able to cure a default on an existing mortgage loan.

✓  I/We will use the proceeds of my new loan toward the following (please check all that apply and/or provide details for "Other"):

    ☐ Medical expenses
    ☐ Home Improvement
    ☑ Investment
    ☐ Education expenses
    ☐ Other (please specify)

    _____

    _____

_____  Other Benefit (please specify):

    _____

    _____

### Acknowledgement of Reasonable Tangible Net Benefit

I/We have carefully considered all of the factors and my/our personal circumstances, and confirm that I/we will receive a reasonable, tangible net benefit by obtaining this loan for the reasons identified above. I/we certify that I/we have read and understand this Reasonable Tangible Net Benefit Statement. I/we have had a chance to ask any questions about this Statement that I/we may have, and that this Statement is true correct.

| Borrower | *8/11/06* Date | Borrower | *8/11/06* Date |
|---|---|---|---|
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |

# EXHIBIT E

# ADJUSTABLE RATE NOTE

### Payment Option

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.**

SEPTEMBER 15TH, 2006          ARLINGTON HEIGHTS          ILLINOIS
[Date]                       [City]                    [State]

708 OAKWOOD DR, WESTMONT, IL 60559

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 300,000.00 (this is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided in this Note. Lender is HOMECOMINGS FINANCIAL NETWORK, INC.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

### (A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will initially pay interest at a yearly rate of 3.0000 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B) Interest Rate Change Dates

The interest rate I will pay may change on the first day of NOVEMBER, 2006 , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. Although the interest rate may change monthly, my monthly payment will be recalculated in accordance with Section 3.

### (C) Interest Rate Limit

My interest rate will never be greater than 9.9500 %.

### (D) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(E) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND FORTY FIVE HUNDREDTHS                                                     percentage point(s)
(   3.4500          %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the first day of each month beginning on   NOVEMBER 1ST, 2006               .
I will make these payments every month until I have paid all the Principal and interest and any other charges that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on OCTOBER 1ST, 2046                          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   9 SYLVAN WAY, SUITE 100, PARSIPPANY, NJ 07054                              or

at a different place if required by the Note Holder.

**(B) Minimum Payment; Amount of My Initial Monthly Payments**

My "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment, which the Note Holder will determine in accordance with this Section 3(B), or Section 3(D), 3(F) or 3(G), below, as applicable.

Each of my initial Minimum Payments will be in the amount of U.S. $   1,073.95                      .
until a new Minimum Payment is required as provided below.

**(C) Payment Change Dates**

My Minimum Payment may change as required by Section 3(D) below beginning on the first day of NOVEMBER, 2011              , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My Minimum Payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay at least the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."

Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment that will be effective on a Payment Change Date will be in the amount of the Full Payment, except that my new Minimum Payment will be limited to an amount that will not be more than 7.5% greater than the amount of my last Minimum Payment due before the Payment Change Date (this limitation is called the "Payment Change Cap"). The Payment Change Cap applies only to the Principal and interest payment and does not apply to any escrow payments the Note Holder may require under the Security Instrument (as defined in Section 11 of this Note, below).

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above. For each month that my monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal may never exceed a maximum amount equal to 115% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid Principal under Section 3(E) above could cause my unpaid Principal to exceed that maximum amount when interest rates increase. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month, regardless of the Payment Change Cap. This amount will be my new Minimum Payment. This means that my Minimum Payment may change more frequently than annually. This new Minimum Payment amount will remain in effect until at least the next regular Payment Change Date, unless another recalculation of my Minimum Payment is required by this Section prior to such Payment Change Date.

**(G) Required Full Payment**

Regardless of the Payment Change Cap, on the  SIXTH   Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying at least the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H) Payment Options**

After the first Interest Rate Change Date, each month the Note Holder may provide me with up to three additional payment options (in addition to the Minimum Payment) that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)     **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option.

(ii)    **Fully Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) at the Maturity Date in substantially equal installments. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.

(iii)   **15 Year Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) within a fifteen (15) year period from the first payment due date in substantially equal installments. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.

Payment Options will only be available if they are greater than the Minimum Payment.

**(I) Failure to Make Adjustments**

If for any reason the Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree the Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold the Note Holder responsible for any damages to me that may result from the Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies that I may have paid to partial Prepayment of unpaid Principal.

## 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received at least the full amount of any Minimum Payment by the end of     15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.0000      % of my overdue Minimum Payment. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay at least the full amount of each Minimum Payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Initials _____

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ _____(Seal)    _____ _____(Seal)
LEE D. WEST                      -Borrower    LYNN M. WEST                     -Borrower

_____ _____(Seal)    _____ _____(Seal)
                                 -Borrower                                    -Borrower

_____ _____(Seal)    _____ _____(Seal)
                                 -Borrower                                    -Borrower

_____ _____(Seal)    _____ _____(Seal)
                                 -Borrower                                    -Borrower

*[Sign Original Only]*

# PREPAYMENT ADDENDUM TO NOTE

SEPTEMBER 15, 2006        ARLINGTON HEIGHTS        ILLINOIS
    **[Date]**           **[City]**           **[State]**

708 OAKWOOD DR, WESTMONT, IL 60559
    **[Property Address]**

FOR VALUE RECEIVED, the undersigned ("Borrower") agree(s) that the following provisions shall be incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed of even date herewith (the "Security Instrument") executed by Borrower, as trustor, in favor of HOMECOMINGS FINANCIAL NETWORK, INC.                    ("Lender"), as beneficiary, and also into that certain promissory note (the "Note") of even date herewith executed by Borrower in favor of Lender. To the extent that the provisions of this Prepayment Addendum to Note (the "Addendum") are inconsistent with the provisions of the Security Instrument and/or the Note, the provisions of the Addendum shall prevail over and shall supersede any such inconsistent provisions of the Security Instrument and/or the Note.

The Note is amended to read as follows:

    **"BORROWER'S RIGHT TO PREPAY**

    I have the right to make prepayments of Principal at a time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all of the monthly payments due under the Note.

    Except as provided below, I may make full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under the Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

    If within **thirty-six** ( 36 ) months from the date of execution of the Security Instrument I make a full Prepayment, or in certain cases a partial Prepayment, and the total of such Prepayment(s) in any 12-month period exceeds twenty percent ( 20 %) of the original Principal amount of this loan, I will pay a Prepayment charge in an amount equal to the payment of six ( 6 ) months' advance interest on the amount by which the total of my Prepayment(s) within that 12-month period exceeds twenty percent ( 20 %) of the original Principal amount of the loan.

NOTICE TO THE BORROWER

    Do not sign this loan agreement before you read it. This loan agreement provides for the payment of a penalty if you wish to repay the loan prior to the date provided for repayment in the loan agreement."

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)    _____ (Seal)
Borrower - LEE D. WEST           Borrower - LYNN M. WEST

_____ (Seal)    _____ (Seal)
Borrower -           Borrower -

_____ (Seal)    _____ (Seal)
Borrower -           Borrower -

## IMPORTANT PREPAYMENT PENALTY DISCLOSURE

The loan you are applying for contains a PREPAYMENT PENALTY provision. If you pay off or refinance this loan, you will be assessed a PREPAYMENT PENALTY calculated according to the following formula:

If within  thirty-six   ( 36 )  months from the date of execution of the Security Instrument I make a full Prepayment, or in certain cases a partial Prepayment, and the total of such Prepayment(s) in any 12-month period exceeds twenty percent ( 20 %) of the original Principal amount of this loan, I will pay a Prepayment charge in an amount equal to the payment of six (6) months' advance interest on the amount by which the total of my Prepayment(s) within that 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan.

Do not sign this document unless you fully understand and accept the prepayment penalty provision of this loan.

_Lee D. West_
Applicant

_9-15-06_
Date

_Lynn M. West_
Applicant

_9-15-06_
Date

_____
Applicant

_____
Date

_____
Applicant

_____
Date

MHCU00027 (04/2006) / 047-024799-8

# EXHIBIT F

Return To:
HOMECOMINGS FINANCIAL NETWORK, INC.
One Meridian Crossing, Ste. 100
Minneapolis MN 55423
Loan Number: 047-024739-6

Prepared By:
Homecomings Financial Network, Inc.
9 Sylvan Way, Suite 310
Parsippany, NJ 07054

——————————— [Space Above This Line For Recording Data] ———————————

# \# Cu-03480-DT    MORTGAGE

MIN 100062604702473960

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated  SEPTEMBER 15TH, 2006
together with all Riders to this document.
(B) "Borrower" is
LEE D. WEST AND LYNN M. WEST

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee
under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

ILLINOIS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS                    Form 3014 1/01

-6A(IL) (0010).01                 MFE:7770 (05/2006) / 047-024739-6
Page 1 of 15                      Initials: 

VMP Mortgage Solutions, Inc.



**(D) "Lender"** is  HOMECOMINGS FINANCIAL NETWORK, INC.

Lender is a  CORPORATION
organized and existing under the laws of  DELAWARE
Lender's address is  9 SYLVAN WAY, SUITE 100
PARSIPPANY, NJ 07054
**(E) "Note"** means the promissory note signed by Borrower and dated SEPTEMBER 15TH, 2006
The Note states that Borrower owes Lender  THREE HUNDRED THOUSAND AND NO/100

Dollars

(U.S. $  300,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than OCTOBER 1ST, 2046
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
**(O) "Periodic Payment"** means the regularly *scheduled* amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

-6A(IL) (0010).01
MFIL7770 (05/2006) / 047-024739-6

Page 2 of 15

Initials:

Form 3014  1/01

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the

    COUNTY                                [Type of Recording Jurisdiction]
of  DUPAGE                                        [Name of Recording Jurisdiction]:

Legal description attached hereto and made a part hereof

Parcel ID Number:  0903202019                          which currently has the address of
708 OAKWOOD DR                                               [Street]
WESTMONT                                 [City], Illinois  60559         [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

-6A(IL) (0010).01                        Page 3 of 15                             Form 3014  1/01
MFIL7770 (05/2006) / 047-024739-6

pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

Initials:

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Initials: _S.D.W._

_L.m.W._

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

*J.D.W.*

Initials _____

*J.M.W.*

-6A(IL) (0010).01

MFIL7770 (05/2006) / 047-024739-6

Page 12 of 15

Form 3014  1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

**25. Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ 
*Lee D. West* (Seal)
-Borrower

LEE D. WEST

_____

_____ 
*Lynn M. West* (Seal)
-Borrower

LYNN M. WEST

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

-6A(IL) (0010).01
MFIL7770 (05/2006) / 047-024739-6

Page 14 of 16

Form 3014   1/01

STATE OF ILLINOIS,                                                              County ss:
I,                                                        , a Notary Public in and for said county and
state do hereby certify that   LEE D. WEST AND LYNN M. WEST

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument,
appeared before me this day in person, and acknowledged that he/she/they signed and delivered the said
instrument as his/her/their free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this   15ᵗʰ   day of   September   2006 .

My Commission Expires:

Notary Public

OFFICIAL SEAL
BRITTIN DAWSON
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:09/21/09



initials:

# ADJUSTABLE RATE RIDER
## Payment Option

THIS ADJUSTABLE RATE RIDER is made this  15TH  day of  SEPTEMBER, 2006
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
HOMECOMINGS FINANCIAL NETWORK, INC.

("Lender") of the same date and covering the property described in the Security Instrument
and located at:

      703 OAKWOOD DR
      WESTMONT, IL 60559

                  [Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST
RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE
AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE.
THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE
AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT
STATED IN THE NOTE.**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

Lender or anyone who takes the Note by transfer and who is entitled to receive payments
under the Note is called the "Note Holder."

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for changes in the interest rate and the monthly payments, as follows:

**2. INTEREST**
    **(A) Interest Rate**
    Interest will be charged on unpaid Principal until the full amount of Principal has been
paid. I will initially pay interest at a yearly rate of    3.0000    %. The interest rate I
will pay may change.
    The interest rate required by this Section 2 is the rate I will pay both before and after any
default described in Section 7(B) of the Note.
    **(B) Interest Rate Change Dates**
    The interest rate I will pay may change on the first day of  NOVEMBER, 2006
and on that day every month thereafter. Each date on which my interest rate could change is

**PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER 10/05**
                        Page 1 of 6

7754106 (04021.02            VMP Mortgage Solutions, Inc.

Initials: ___

called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. Although the interest rate may change monthly, my monthly payment will be recalculated in accordance with Section 3.

(C) Interest Rate Limit

My interest rate will never be greater than        9.9500         %.

(D) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(E) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding  THREE AND FORTY FIVE HUNDREDTHS
percentage point(s) [   3.4500            %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

## 3. PAYMENTS

(A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the first day of each month beginning on NOVEMBER 1ST,  2006        . I will make these payments every month until I have paid all the Principal and interest and any other charges that I may owe under the Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on OCTOBER 1ST, 2046         , I still owe amounts under the Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

Initials: *J.P.W.*

*L.M.W.*

7754105 (0402).02                Page 2 of 6

I will make my monthly payments at 9 SYLVAN WAY, SUITE 100, PARSIPPANY, NJ 07054
or at a different place if required by the Note Holder.

**(B) Minimum Payment; Amount of My Initial Monthly Payments**

My "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment, which the Note Holder will determine in accordance with this Section 3(B), or Section 3(D), 3(F) or 3(G), below, as applicable.

Each of my initial Minimum Payments will be in the amount of U.S. $ 1,073.95 , until a new Minimum Payment is required as provided below.

**(C) Payment Change Dates**

My Minimum Payment may change as required by Section 3(D) below beginning on the first day of NOVEMBER, 2011 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My Minimum Payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay at least the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in *substantially* equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."

Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment that will be effective on a Payment Change Date will be in the amount of the Full Payment, except that my new Minimum Payment will be limited to an amount that will not be more than 7.5% greater than the amount of my last Minimum Payment due before the Payment Change Date (this limitation is called the "Payment Change Cap"). The Payment Change Cap applies only to the Principal and interest payment and does not apply to any escrow payments the Note Holder may require under the Security Instrument.

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above. For each month that my monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

Initials: _____

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal may never exceed a maximum amount equal to 115% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid Principal under Section 3(E) above could cause my unpaid Principal to exceed that *maximum* amount when interest rates increase. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month, regardless of the Payment Change Cap. This amount will be my new Minimum Payment. This means that my Minimum Payment may change more frequently than annually. This new Minimum Payment amount will remain in effect until at least the next regular Payment Change Date, unless another recalculation of my Minimum Payment is required by this Section prior to such Payment Change Date.

**(G) Required Full Payment**

Regardless of the Payment Change Cap, on the SIXTH Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying at least the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H) Payment Options**

After the first Interest Rate Change Date, each month the Note Holder may provide me with up to three additional payment options (in addition to the Minimum Payment) that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i) **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option.

(ii) **Fully Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) at the Maturity Date in substantially equal installments. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.

(iii) **15 Year Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) within a fifteen (15) year period from the first payment due date in substantially equal installments. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.

Payment Options will only be available if they are greater than the Minimum Payment.

**(I) Failure to Make Adjustments**

If for any reason the Note Holder fails to make an adjustment to the interest rate or payment amount as described herein, regardless of any notice requirement, I agree the Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold the Note Holder responsible for any damages to me

Initials: _____

7754105 (0402).02
MFCD6282 (04/2006) / 043-034735-6

Page 4 of 5

that may result from the Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies that I may have paid to partial Prepayment of unpaid Principal.

**4. NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Initials: _____

7754106 [0402].02

Page 5 of 5

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
-Borrower
LEE D. WEST

_____ (Seal)
-Borrower
LYNN M. WEST

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

7754105 (0402).02
MFCD8262 (04/2008) / 047-024789-6

Page 6 of 6

## SCHEDULE C

File No.: 2006-03482-1-PT                          Commitment No.: 2006-03482-1-PT

**PROPERTY DESCRIPTION**

The land referred to in this commitment is described as follows:

LOT 100 IN OAKWOOD UNIT ONE, BEING A SUBDIVISION OF PART OF THE NORTHWEST 1/4 OF SECTION 2 AND PART OF THE NORTHEAST 1/4 OF SECTION 3, TOWNSHIP 38 NORTH, RANGE 11, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED October 27, 1971 AS DOCUMENT R71-55525 AND CERTIFICATES OF CORRECTION FILED November 12, 1971 AS DOCUMENT R71-58547 AND December 27, 1972 AS DOCUMENT R72-78535, IN DUPAGE COUNTY, ILLINOIS.



09-03-202-019-0000

# EXHIBIT G

OMB NO. 2502-0265

**U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT**

**SETTLEMENT STATEMENT**

| A. | | | |
|---|---|---|---|
| 1. ☐ FHA | 2. ☐ FmHA | 3. ☒ CONV. UNINS. | 4. ☐ VA | 5. ☐ CONV. INS. |

| 6. FILE NUMBER: | 7. LOAN NUMBER: |
|---|---|
| 2006-03482-PT | 047-024739-8 |

8. MORTGAGE INS CASE NUMBER:

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(POC)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

1B  2/98   2006-03482-PT PT(2006-03482-PT/43)

| D. NAME AND ADDRESS OF BORROWER: | E. NAME AND ADDRESS OF SELLER: | F. NAME AND ADDRESS OF LENDER: |
|---|---|---|
| LEE D. WEST and LYNN M. WEST 708 OAKWOOD DRIVE WESTMONT, IL 60559 | | HOMECOMINGS FINANCIAL 9 Sylvan Way Suite 106 Parsippany, NJ 07054 |

| G. PROPERTY LOCATION: | H. SETTLEMENT AGENT: | I. SETTLEMENT DATE: |
|---|---|---|
| 708 OAKWOOD DRIVE WESTMONT, IL 60559 DuPage County, Illinois LOT 100 OAKWOOD UNIT ONE 09-03-202-015-0000 | Premier Title  PLACE OF SETTLEMENT 1000 Jorie Blvd. Suite 136 Oak Brook, IL 60523 | September 15, 2006 Disburse:09/20/06 |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract Sales Price | | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to Borrower (Line 1400) | 28,044.28 | 403. | |
| 104. Need Payoff Letter to Citimortgage | 214,170.49 | 404. | |
| 105. Need Payoff Letter to Citibank | 45,508.70 | 405. | |
| *Adjustments For Items Paid By Seller in advance* | | *Adjustments For Items Paid By Seller in advance* | |
| 106. City/Town Taxes to | | 406. City/Town Taxes to | |
| 107. County Taxes to | | 407. County Taxes to | |
| 108. County Taxes to | | 408. County Taxes to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 287,723.47 | **420. GROSS AMOUNT DUE TO SELLER** | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | | 501. Excess Deposit (See Instructions) | |
| 202. Principal Amount of New Loan(s) | 300,000.00 | 502. Settlement Charges to Seller (Line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. 2nd Mortgage Proceeds | 13,647.94 | 504. Payoff First Mortgage | |
| 205. | | 505. Payoff Second Mortgage | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments For Items Unpaid By Seller* | | *Adjustments For Items Unpaid By Seller* | |
| 210. City/Town Taxes to | | 510. City/Town Taxes to | |
| 211. County Taxes to | | 511. County Taxes to | |
| 212. County Taxes to | | 512. County Taxes to | |
| 213. Assessments | | 513. Assessments | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 313,647.94 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **800. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross Amount Due From Borrower (Line 120) | 287,723.47 | 601. Gross Amount Due To Seller (Line 420) | |
| 302. Less Amount Paid By/For Borrower (Line 220) | ( 313,647.94) | 602. Less Reductions Due Seller (Line 520) | ( ) |
| **303. CASH ( FROM ) ( X TO ) BORROWER** | 25,924.47 | **603. CASH ( TO ) ( FROM ) SELLER** | 0.00 |

| L. SETTLEMENT CHARGES | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| **700. TOTAL COMMISSION Based on Price** $ @ % | | | |
| Division of Commission (line 700) as follows: | | | |
| 701. $ to | | | |
| 702. $ to | | | |
| 703. Commission Paid at Settlement | | | |
| 704. to | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | |
| 801. Loan Origination Fee % to | | | |
| 802. Loan Discount % to | | | |
| 803. Appraisal Fee to Copiague Funding Corp. POC $300.00 | | | |
| 804. Credit Report to | | | |
| 805. Commitment Fee to | | | |
| 806. Funding Fee to North American Settlement | | 705.00 | |
| 807. Underwriting Fee to | | | |
| 808. | | | |
| 809. Broker Fee from HF to Broker to Copiague Funding Corp. POC $7,875.00 | | | |
| 810. Flood Certification | | | |
| 811. Lender Loan Charge to HOMECOMINGS FINANCIAL | | 666.00 | |
| 812. Processing Fee to Copiague Funding Corp. | | 550.00 | |
| 813. Courier Fee | | | |
| 814. Administration Fee | | | |
| 815. | | | |
| 816. | | | |
| 817. | | | |
| 818. | | | |
| 819. | | | |
| 820. | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | |
| 901. Interest From 09/20/06 to 10/01/08 @ $ 24.857500/day ( 11 days %) | | 271.23 | |
| 902. Mortgage Insurance Premium for 12 months to | | | |
| 903. Hazard Insurance Premium for 1.0 years to LIBERTY MUTUAL GROUP | | 371.20 | |
| 904. | | | |
| 905. | | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | | |
| 1001. Hazard Insurance 8.000 months @ $ 38.17 per month | | 229.02 | |
| 1002. Mortgage Insurance months @ $ per month | | | |
| 1003. City/Town Taxes months @ $ per month | | | |
| 1004. County Taxes months @ $ per month | | | |
| 1005. County Taxes 3.000 months @ $ 391.78 per month | | 1,175.34 | |
| 1006. months @ $ per month | | | |
| 1007. months @ $ per month | | | |
| 1008. Aggregate Adjustment months @ $ per month | | -114.51 | |
| **1100. TITLE CHARGES** | | | |
| 1101. Settlement/Closing Fee to Premier Title | | 425.00 | |
| 1102. Update Fee to Premier Title | | 50.00 | |
| 1103. DFI Fee to Premier Title Reserve Account | | 3.00 | |
| 1104. Overnight Payoff & Processing to Premier Title | | | |
| 1105. Document Preparation to Premier Title | | | |
| 1106. Title-Chain of Title/Trust Fee to Premier Title | | | |
| 1107. EPL Endorsement to Premier Title | | 125.00 | |
| (includes above item numbers: ) | | | |
| 1108. Title Insurance to Premier Title | | 425.00 | |
| (includes above item numbers: ) | | | |
| 1109. Lender's Coverage $ 300,000.00 425.00 | | | |
| 1110. Owner's Coverage $ | | | |
| 1111. NEG AMORTIZATION ENDORSEMENT to Premier Title | | 125.00 | |
| 1112. ARM ENDORSEMENT to Premier Title | | 125.00 | |
| 1113. Premier Title | | | |
| 1114. Premier Title | | | |
| 1115. Premier Title | | | |
| 1116. Premier Title | | | |
| 1117. Premier Title | | | |
| 1118. Premier Title | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | |
| 1201. Recording Fees: Deed $ ; Mortgage $ 56.00; Release $ 40.00 | | 96.00 | |
| 1202. City/County Tax/Stamps: Deed ; Mortgage | | | |
| 1203. State Tax/Stamps: Deed ; Mortgage | | | |
| 1204. Chicago Title Company | | | |
| 1205. Chicago Title Company | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | |
| 1301. Survey to | | | |
| 1302. Pest Inspection to | | | |
| 1303. Payment to Sears | | 264.00 | |
| 1304. Payment to Sears | | 288.00 | |
| 1305. See addt'l disb. exhibit to | | 22,271.00 | |
| **1400. TOTAL SETTLEMENT CHARGES (Enter on Lines 103, Section J and 502, Section K)** | | 28,044.29 | |

Certified to be a true copy.

## ACKNOWLEDGMENT OF RECEIPT OF SETTLEMENT STATEMENT

| | |
|---|---|
| Borrower: | LEE D. WEST and LYNN M. WEST |
| Lender: | HOMECOMINGS FINANCIAL |
| Settlement Agent: | Premier Title |
| | 847-255-7100 |
| Place of Settlement: | 1350 W. NW Hwy |
| | Arlington Heights, IL 60004 |
| Settlement Date: | September 15, 2006 |
| Disbursement Date: | September 20, 2006 |
| Property Location: | 708 OAKWOOD DRIVE |
| | WESTMONT, IL 60559 |
| | DuPage - 2nd County, Illinois |
| | LOT 100 |
| | OAKWOOD UNIT ONE |
| | 09-03-202-019-0000 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_____
LEE D. WEST

_____
LYNN M. WEST

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

_____
Premier Title
Settlement Agent

WARNING: It is a crime to knowingly make false statements to the United States on this or any similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

# EXHIBIT H

| A. | | | B. TYPE OF LOAN: | | |
|---|---|---|---|---|---|
| U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT | | | 1. ☐ FHA   2. ☐ FmHA   3. ☒ CONV. UNINS.   4. ☐ VA   5. ☐ CONV. INS. | | |
| **SETTLEMENT STATEMENT** | | | 6. FILE NUMBER: 2006-03482-PT | 7. LOAN NUMBER: 047-024739-8 | |
| | | | 8. MORTGAGE INS CASE NUMBER: | | |

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(POC)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.
19    5/6    (2006-03482-PT.PT/2006-03482-PT/26)

| D. NAME AND ADDRESS OF BORROWER: | E. NAME AND ADDRESS OF SELLER: | F. NAME AND ADDRESS OF LENDER: |
|---|---|---|
| LEE D. WEST and LYNN M. WEST 708 OAKWOOD DRIVE WESTMONT, IL 60559 | | HOMECOMINGS FINANCIAL 9 Sylvan Way Suite 100 Parsippany, NJ 07054 |

| G. PROPERTY LOCATION: | H. SETTLEMENT AGENT: | I. SETTLEMENT DATE: |
|---|---|---|
| 708 OAKWOOD DRIVE WESTMONT, IL 60559 DuPage County, Illinois LOT 100 OAKWOOD UNIT ONE 09-03-202-019-0000 | Premier Title | September 15, 2006 |
| | PLACE OF SETTLEMENT 1000 Jorie Blvd. Suite 136 Oak Brook, IL 60523 | Disburse:09/20/06 |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract Sales Price | | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to Borrower (Line 1400) | 27,344.28 | 403. | |
| 104. Need Payoff Letter to Citimortgage | 214,170.49 | 404. | |
| 105. Need Payoff Letter to Citibank | 45,508.70 | 405. | |
| Adjustments For Items Paid By Seller in advance | | Adjustments For Items Paid By Seller in advance | |
| 106. City/Town Taxes        to | | 406. City/Town Taxes        to | |
| 107. County Taxes           to | | 407. County Taxes           to | |
| 108. County Taxes           to | | 408. County Taxes           to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 287,023.47 | **420. GROSS AMOUNT DUE TO SELLER** | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | | 501. Excess Deposit (See instructions) | |
| 202. Principal Amount of New Loan(s) | 300,000.00 | 502. Settlement Charges to Seller (Line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. 2nd Mortgage Proceeds | 13,897.94 | 504. Payoff First Mortgage | |
| 205. | | 505. Payoff Second Mortgage | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments For Items Unpaid By Seller | | Adjustments For Items Unpaid By Seller | |
| 210. City/Town Taxes        to | | 510. City/Town Taxes        to | |
| 211. County Taxes           to | | 511. County Taxes           to | |
| 212. County Taxes           to | | 512. County Taxes           to | |
| 213. Assessments | | 513. Assessments | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 313,897.94 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross Amount Due From Borrower (Line 120) | 287,023.47 | 601. Gross Amount Due To Seller (Line 420) | |
| 302. Less Amount Paid By/For Borrower (Line 220) | 313,897.94 | 602. Less Reductions Due Seller (Line 520) | |
| **303. CASH ( FROM ) ( X TO ) BORROWER** | 26,874.47 | **603. CASH ( TO ) ( FROM ) SELLER** | 0.00 |

| | | | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|---|
| **700. TOTAL COMMISSION Based on Price** | $ | @ | % | | |
| Division of Commission (line 700) as follows: | | | | | |
| 701. $ | to | | | | |
| 702. $ | to | | | | |
| 703. Commission Paid at Settlement | | | | | |
| 704. | | to | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | | | |
| 801. Loan Origination Fee | % | to | | | |
| 802. Loan Discount | % | to | | | |
| 803. Appraisal Fee | | to Coplague Funding Corp. | POC $300.00 | | |
| 804. Credit Report | | to | | | |
| 805. Commitment Fee | | to | | | |
| 806. Tax Service Fee | | to | | | |
| 807. Underwriting Fee | | to | | | |
| 808. | | | | | |
| 809. Broker Fee from HF to Broker | | to Coplague Funding Corp. | POC $7,875.00 | | |
| 810. Flood Certification | | | | | |
| 811. Lender Loan Charge | | to HOMECOMINGS FINANCIAL | | 995.00 | |
| 812. Processing Fee | | to Coplague Funding Corp. | | 650.00 | |
| 813. Courier Fee | | | | | |
| 814. Administration Fee | | | | | |
| 815. | | | | | |
| 816. | | | | | |
| 817. | | | | | |
| 818. | | | | | |
| 819. | | | | | |
| 820. | | | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | | | |
| 901. Interest From 09/20/06 to 10/01/06 @ $ 24.667500/day ( 11 days %) | | | | 271.23 | |
| 902. Mortgage Insurance Premium for 12 months to | | | | | |
| 903. Hazard Insurance Premium for 1.0 years to LIBERTY MUTUAL GROUP | | | | 371.20 | |
| 904. | | | | | |
| 905. | | | | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | | | | |
| 1001. Hazard Insurance | 8.000 | months @ $ 38.17 per month | | 229.02 | |
| 1002. Mortgage Insurance | | months @ $ per month | | | |
| 1003. City/Town Taxes | | months @ $ per month | | | |
| 1004. County Taxes | | months @ $ per month | | | |
| 1005. County Taxes | 3.000 | months @ $ 391.78 per month | | 1,175.34 | |
| 1006. | | months @ $ per month | | | |
| 1007. | | months @ $ per month | | | |
| 1008. Aggregate Adjustment | | months @ $ per month | | -114.51 | |
| **1100. TITLE CHARGES** | | | | | |
| 1101. Settlement/Closing Fee | to Premier Title | | | 425.00 | |
| 1102. Update Fee | to Premier Title | | | 50.00 | |
| 1103. DFI Fee | to Premier Title Reserve Account | | | 3.00 | |
| 1104. Overnight Payoff & Processing | to Premier Title | | | | |
| 1105. Document Preparation | to Premier Title | | | | |
| 1106. Title-Chain of Title/Tract Fee | to Premier Title | | | | |
| 1107. EPL Endorsement | to Premier Title | | | 125.00 | |
| (includes above item numbers: | | | ) | | |
| 1108. Title Insurance | to Premier Title | | | 425.00 | |
| (includes above item numbers: | | | ) | | |
| 1109. Lender's Coverage | $ 300,000.00 | | 425.00 | | |
| 1110. Owner's Coverage | $ | | | | |
| 1111. NEG AMORTIZATION ENDORSEMENT | to Premier Title | | | 125.00 | |
| 1112. ARM ENDORSEMENT | to Premier Title | | | 125.00 | |
| 1113. | Premier Title | | | | |
| 1114. | Premier Title | | | | |
| 1115. | Premier Title | | | | |
| 1116. | Premier Title | | | | |
| 1117. | Premier Title | | | | |
| 1118. | Premier Title | | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | | | |
| 1201. Recording Fees: Deed $ ; Mortgage $ 56.00 ; Releases $ 40.00 | | | | 96.00 | |
| 1202. City/County Tax/Stamps: Deed ; Mortgage | | | | | |
| 1203. State Tax/Stamps: Deed ; Mortgage | | | | | |
| 1204. | Chicago Title Company | | | | |
| 1205. | Chicago Title Company | | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | | | |
| 1301. Survey | to | | | | |
| 1302. Pest Inspection | to | | | | |
| 1303. Payment | to Sears | | | 284.00 | |
| 1304. Payment | to Sears | | | 288.80 | |
| 1305. Seller Attorney Fees | to Thomas Anselmo | | | 22,271.00 | |
| **1400. TOTAL SETTLEMENT CHARGES (Enter on Lines 103, Section J and 502, Section K)** | | | | 27,344.28 | |

Certified to be a true copy.

## ACKNOWLEDGMENT OF RECEIPT OF SETTLEMENT STATEMENT

|  |  |
|---|---|
| **Borrower:** | LEE D. WEST and LYNN M. WEST |
| **Lender:** | HOMECOMINGS FINANCIAL |
| **Settlement Agent:** | Premier Title |
|  | 847-255-7100 |
| **Place of Settlement:** | 1350 W. NW Hwy |
|  | Arlington Heights, IL 60004 |
| **Settlement Date:** | September 15, 2006 |
| **Disbursement Date:** | September 20, 2006 |
| **Property Location:** | 708 OAKWOOD DRIVE |
|  | WESTMONT, IL 60559 |
|  | DuPage County, Illinois |
|  | LOT 100 |
|  | OAKWOOD UNIT ONE |
|  | 09-03-202-019-0000 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

*Lee D. West*

LEE D. WEST

*Lynn M. West*

LYNN M. WEST

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

Premier Title

Settlement Agent

WARNING: It is a crime to knowingly make false statements to the United States on this or any similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

## ADDITIONAL DISBURSEMENTS EXHIBIT

**Borrower:** LEE D. WEST and LYNN M. WEST
**Lender:** HOMECOMINGS FINANCIAL
**Settlement Agent:** Premier Title
847-255-7100
**Place of Settlement:** 1350 W. NW Hwy
Arlington Heights, IL 60004
**Settlement Date:** September 15, 2006
**Disbursement Date:** September 20, 2006
**Property Location:** 708 OAKWOOD DRIVE
WESTMONT, IL 60559
DuPage County, Illinois
LOT 100
OAKWOOD UNIT ONE
09-03-202-019-0000

| PAYEE/DESCRIPTION | NOTE/REF NO | BORROWER | SELLER |
|---|---|---|---|
| Sears<br>Payment | | 935.00 | |
| JC Penney<br>Payment | | 46.00 | |
| Nicor Gas<br>Payment | | 208.00 | |
| HSBC<br>Payment | | 2,165.00 | |
| Washington Mutual<br>Payment | | 9,269.00 | |
| BarClays Bank<br>Payment | | 2,173.00 | |
| Chase<br>Payment | | 5,600.00 | |
| Capital 1<br>Payment | | 1,280.00 | |
| Fifth Third Bank<br>Payment | | 595.00 | |
| **Total Additional Disbursements shown on Line 1305** | | **$    22,271.00** | **$         0.00** |

# EXHIBIT I

Borrower:                                    Creditor:

LEE WEST                                     HOMECOMINGS FINANCIAL NETWORK, INC.
708 OAKWOOD DR                               9 SYLVAN WAY, SUITE 100
WESTMONT, IL 60559                           PARSIPPANY, NJ 07054

Loan Number:  047-024739-6                   Date:  09/15/2006

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of payments |
|---|---|---|---|
| The cost of your credit as a yearly rate | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 8.1639% | $825,975.18 | $297,313.77 | $1,123,288.95 |

Your payment schedule will be:

| No. of Pmts | Amt. of Pmts | Monthly Pmts Begin | No. of Pmts | Amt. of Pmts | Monthly Pmts Begin | No. of Pmts | Amt. of Pmts | Monthly Pmts Begin |
|---|---|---|---|---|---|---|---|---|
| 42 | 1073.95 | 11/01/2006 | | | | | | |
| 437 | 2461.59 | 05/01/2010 | | | | | | |
| 1 | 2466.22 | 10/01/2046 | | | | | | |

**VARIABLE RATE:**  Your loan contains a variable-rate feature.  Disclosures about the variable-rate feature have been provided to you earlier.

**INSURANCE:** The following insurance is required to obtain credit:   * Property
You may obtain the insurance from anyone that is acceptable to creditor.

**SECURITY:**  You are giving a security interest in real property you already own.
Property Address: 708 OAKWOOD DR, WESTMONT, IL  60559

**LATE CHARGE:**  If a payment is more than 15 days late, you will be charged 5 % of the overdue payment of principal and interest.

**PREPAYMENT:**  If you pay off your loan early,  * You may have to pay a penalty.
* You will not be entitled to a refund of part of the finance charge.

**ASSUMPTION:**  Someone buying your property may assume the remainder of your loan on the original terms.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.

_Lee D. West_                9-15-06          _Lynn M. West_          9-15-06
LEE D. WEST                  DATE             LYNN M. WEST            DATE

# EXHIBIT J

**LENDER:**  HOMECOMINGS FINANCIAL NETWORK, INC.
9 SYLVAN WAY, SUITE 100
PARSIPPANY, NJ 07054

**DATE:** 09/15/2006
**LOAN NO.:** 047-024739-6
**TYPE:** POA:1M MTA

**BORROWERS:**  LEE D. WEST                    LYNN M. WEST

**ADDRESS:**  708 OAKWOOD DR
**CITY/STATE/ZIP:**  WESTMONT, IL 60559
**PROPERTY:**

You are entering into a transaction that will result in a mortgage on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

(1) The date of the transaction, which is   SEPTEMBER 15TH, 2006        ; or
(2) The date you received your Truth in Lending disclosures; or
(3) The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage on your home has been cancelled, and we must return to you any money or property you have given us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

---

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing at:

HOMECOMINGS FINANCIAL NETWORK, INC.
9 Sylvan Way, Suite 310
Parsippany, NJ 07054
FAX: (973) 829-1900

You may use any written statement that is signed and dated by you and states your intention to cancel and/or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of  SEPTEMBER 19TH,
2006             (or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above.) If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

---

**SIGNATURE** _____          **DATE**

---

The undersigned each acknowledge receipt of two copies of NOTICE of RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

| | | | |
|---|---|---|---|
| _Lee D. West_ | _9-15-06_ | _Lynn M. West_ | _9-15-06_ |
| LEE D. WEST    Date | Date | LYNN M. WEST | Date |
| _____ | _____ | _____ | _____ |
| Date | Date | | Date |
| _____ | _____ | _____ | _____ |
| Date | Date | | Date |
| _____ | _____ | _____ | _____ |
| Date | Date | | Date |
| _____ | _____ | _____ | _____ |
| Date | Date | | Date |
| _____ | _____ | _____ | _____ |
| Date | Date | | Date |

# EXHIBIT K

## NOTE

| SEPTEMBER 15TH    2006 | ARLINGTON HEIGHTS        , Illinois |
| Date | City |

| 708 OAKWOOD DR | WESTMONT    IL   62552 |
| Property Address | City | State | ZIP Code |

### 1. DEFINITIONS

The headings at the beginning of each section are for convenience only and are not to be used in interpreting the text of the sections. "☒" means the terms that apply to this loan. "I," "me" or "my" means each Borrower who signs this note and each other person or legal entity (including guarantors, endorsers, and sureties) who agrees to pay this note (together referred to as "us"). The Lender is HOMECOMINGS FINANCIAL NETWORK, INC. "You" or "your" means the Lender and its successors and assigns.

### 2. BORROWER'S PROMISE TO PAY

For value received, I promise to pay to you, or your order, the **PRINCIPAL** sum of FIFTEEN THOUSAND AND NO/100 ............................ Dollars $ .......15,000.00.. plus interest. No additional advances are contemplated under this Note.

### 3. INTEREST

I agree to pay interest on the outstanding principal balance at the rate of .......9.5250. % per year until the full amount of principal has been paid. Interest accrues on the principal remaining unpaid from time to time, until paid in full. The interest rate and other charges on this loan will never exceed the highest rate or charge allowed by law for this loan.

**ACCRUAL METHOD:** Interest will be calculated on a ...30/360................................................... basis. For interest calculation, the accrual method will determine the number of days in a year. If no accrual method is stated, then you may use any reasonable accrual method for calculating interest.

**POST MATURITY RATE:** I agree to pay interest on the unpaid balance of this note owing after maturity, and until paid in full, .at same rate as above...................................................... .

For purposes of this paragraph, maturity occurs:

(1) On the date of the last scheduled payment of principal; or
(2) On the date you accelerate the due date of this loan (demand immediate payment).

### 4. PAYMENTS

I agree to pay this note in monthly payments. I will make my monthly payment on the ...FIRST...... day of each month beginning on NOVEMBER 1ST, 2006..... . The monthly payment will be $..........128.49.... . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this note or until my balloon payment is due, if a balloon payment is indicated below. Unless otherwise required by law, each payment I make on this loan will be applied first to any charges I owe you other than principal and interest, then to interest that is due, and finally to principal. The final payment of the entire unpaid balance of principal and interest will be due .OCTOBER 1ST, 2021......, which is called the "Maturity Date."

The actual amount of my final payment will depend on my payment record. If any payment due under this loan does not equal or exceed the amount of interest due, you may, at your option, increase the amount of the payment due and all future payments to an amount that will pay off this loan in equal payments over the remaining term of this loan, subject to any balloon payment indicated below.

I will make my monthly payments at .ONE MERIDIAN CROSSING, SUITE 100, MINNEAPOLIS, MN  55423 ........... or at a different place if required by you.

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell you in writing that I am doing so. I may make a full prepayment or partial prepayments without paying any prepayment penalty. You will use all of my prepayments to reduce the amount of principal that I owe under this note. I must still make each later payment in the original amount as it becomes due until this note is paid in full.

☒ **BALLOON PAYMENT:** This loan is payable in full at maturity. I must repay the entire principal balance of the loan and unpaid interest then due. The Lender is under no obligation to refinance the loan at that time. I will, therefore, be required to make payment out of other assets that I may own, or I will have to find a Lender, which may be the Lender I have this loan with, willing to lend me the money. If I refinance this loan at maturity, I may have to pay some or all of the closing costs normally associated with a new loan even if I obtain refinancing from the same Lender.

**LATE CHARGE:** If a payment is made more than 10 calendar days after it is due, I agree to pay a late charge of 5% of the amount due. ☒ This late charge will not be ☐ more ☒ less  than $ ..........10.00... . I will pay this late charge only once on each late payment.

### 5. RETURNED CHECK CHARGE: I agree to pay a fee of $..25.00............ in connection with any payment of mine by check or similar item that is dishonored.

### 6. SECURITY

My obligations under this note are separately secured by a Mortgage dated the same date as this note.

Any present or future agreement securing any other debt I owe you also will secure the payment of this loan. Property securing another debt will not secure this loan if such property is my principal dwelling and you fail to provide any required notice of right of rescission. Also, property securing another debt will not secure this loan to the extent such property is in household goods.

(page 1 of 2)

Initials          Initials

**7. APPLICABLE LAW:** This note and any agreement securing this note will be governed by the laws of the state of Illinois. The fact that any part of this note cannot be enforced will not affect the rest of this note. Any change to this note or any agreement securing this note must be in writing and signed by you and me.

**8. COMMISSIONS:** I understand and agree that you (or your affiliate) will earn commissions or fees on any insurance products, and may earn such fees on other services, that I buy through you or your affiliate.

**9. PAYMENTS BY LENDER:** If you are authorized to pay, on my behalf, charges I am obligated to pay (such as property insurance premiums), then you may treat those payments made by you as advances and add them to the unpaid principal under this note, or you may demand immediate payment of the charges.

**10. ASSUMPTION:** This note and any document securing it cannot be assumed by someone buying the secured property from me. This will be true unless you agree in writing to the contrary. Without such an agreement, if I try to transfer any interest in the property securing this note, I will be in default on this loan. You may proceed against me under any due on sale clause in the security agreement, which is incorporated by reference.

**11. REAL ESTATE OR RESIDENCE SECURITY:** If this note is secured by real estate or a residence that is personal property, the existence of a default and my remedies for such a default will be determined by applicable law, by the terms of any separate instrument creating the security interest and, to the extent not prohibited by law and not contrary to the terms of the separate security instrument, by this agreement.

**12. DEFAULT:** Subject to any limitations in the "REAL ESTATE AND RESIDENCE SECURITY" paragraph above, I will be in default on this note if any of the following occur:

(1) I engage in fraud or material misrepresentation, by my actions or failure to act, in connection with any phase of this note;

(2) I fail to make a payment on time or in the amount due;

(3) I take any action or inaction which adversely affects the collateral or your rights in the collateral, including but not limited to: (a) failure to maintain property insurance and flood insurance, if required, on the dwelling; (b) transfer of the property; (c) failure to maintain the property; (d) use of the property in a destructive manner; (e) failure to pay taxes on the property; (f) death; (g) the property is taken through eminent domain; (h) a judgment is filed against me and subjects the property to action that adversely affects your interest; or (i) a prior lien holder forecloses on the property and as a result, your interest is adversely affected.

**13. REMEDIES:** Subject to any limitations in the "REAL ESTATE AND RESIDENCE SECURITY" section above, if I am in default on this loan or any agreement securing this loan, you may:

(1) Make unpaid principal, earned interest and all other agreed charges I owe you under this loan immediately due;

(2) Demand more security or new parties obligated to pay this loan (or both) in return for not using any other remedy;

(3) Make a claim for any and all insurance benefits or refunds that may be available on my default;

(4) Use any remedy you have under state or federal law; and

(5) Use any remedy given to you in any agreement securing this loan.

By choosing any one or more of these remedies you do not give up your right to use another remedy later. By deciding not to use any remedy should I be in default, you do not give up your right to consider the event a default if it happens again.

**14. COLLECTION COSTS AND ATTORNEY'S FEES:** I agree to pay all costs of collection, replevin or any other or similar type of cost if I am in default. In addition, if you hire an attorney to collect this note, I also agree to pay any fee you incur with such attorney plus court costs (except where prohibited by law). To the extent permitted by the United States Bankruptcy Code, I also agree to pay the reasonable attorney's fees and costs you incur to collect this debt as awarded by any court exercising jurisdiction under the Bankruptcy Code.

**15. WAIVER:** I waive (to the extent permitted by law) demand, presentment, protest, notice of dishonor and notice of protest.

**16. OBLIGATIONS INDEPENDENT:** I understand that my obligation to pay off all of the amounts owed under this loan is independent of the obligation of any other person who has also agreed to pay it. You may, without notice, release me or any of us, give up any right you may have against any of us, extend new credit to any of us, or renew or change this note one or more times and for any term, and I will still be obligated to pay this loan. You may, without notice, fail to perfect your security interest in, impair, or release any security and I will still be obligated to pay this loan.

**17. CREDIT INFORMATION:** I agree that from time to time you may receive credit information about me from others, including other lenders and credit reporting agencies. I agree that you may furnish on a regular basis credit and experience information regarding my loan to others seeking such information. To the extent permitted by law, I agree that you will not be liable for any claim arising from the use of information provided to you by others or for providing such information to others. I will give you any financial statements or information that you feel is necessary. All financial statements and information I give you will be correct and complete.

**18. PURCHASE MONEY LOAN:** If this is a purchase money loan, you may include the name of the seller on the check or draft for this loan.

**SIGNATURES: I AGREE TO THE TERMS OF THIS NOTE.** I have received a copy of this note.

| | | | |
|---|---|---|---|
| _Lee D. West_ | 9-15-06 | | |
| Date    LEE D. WEST | Borrower    Date    LYNN M. WEST | | Borrower |
| _Lynn M. West_ | 9-15-06 | | |
| Date | Borrower    Date | | Borrower |

(Sign Original Only)

MPL6039 - (12/02) / 047-069235-3
Experi © 1994, 1997, 1996 Bankers Systems, Inc. St. Cloud, MN Form RFC-CESMZIL 10/11/2002          (page 2 of 2)

# EXHIBIT L

This document was prepared by:
HOMECOMINGS FINANCIAL NETWORK, INC.
9 Sylvan Way, Suite 310
Parsippany, NJ 07054

When recorded, please return to:
HOMECOMINGS FINANCIAL NETWORK, INC.
One Meridian Crossing, Ste. 100
Minneapolis, MN 55423

_____ State of Illinois _____                    Space Above This Line For Recording Data

# MORTGAGE

**(With Future Advance Clause)**    MIN: 100062604705923532

1. **DATE AND PARTIES.** The date of this Mortgage (Security Instrument) is ...SEPTEMBER 15TH, 2006........ and the parties, their addresses and tax identification numbers, if required, are as follows:

    MORTGAGOR: LEE D. WEST AND LYNN M. WEST

    LENDER: HOMECOMINGS FINANCIAL NETWORK, INC.
    9 SYLVAN WAY, SUITE 100
    PARSIPPANY, NJ 07054

    "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debt (defined below) and Mortgagor's performance under this Security Instrument, Mortgagor grants, bargains, sells, conveys, mortgages and warrants to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property:

    Legal description attached hereto and made a part hereof

    The property is located in ...DUPAGE............................ at ..708 OAKWOOD DR.........................
    .................................................................................. (County)
    ..............................................., WESTMONT............................, Illinois ..60559...........
    (Address)                              (City)                              (ZIP Code)

    Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, ditches, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property"). Mortgagor understands and agrees that MERS holds only legal title to the interests granted by Mortgagor in this Security Instrument; but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property, and to take any action required of Lender, including but not limited to, releasing and canceling this Security Instrument.

3. **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:

    A. Debt incurred under the terms of all promissory note(s), contract(s), guaranty(s) or other evidence of debt described below and all their extensions, renewals, modifications or substitutions. *(When referencing the debts below it is suggested that you include items such as borrowers' names, note amounts, interest rates, maturity dates, etc.)*

    Borrower(s) Promissory Note to Lender dated SEPTEMBER 15TH, 2006  in the principal sum of
    U.S. $      15,000.00, with interest thereon, providing for monthly installments of principal
    and interest, with the balance of indebtedness, if not sooner paid, due and payable on  OCTOBER 1ST, 2021 .

B. All future advances from Lender to Mortgagor or other future obligations of Mortgagor to Lender under any promissory note, contract, guaranty, or other evidence of debt executed by Mortgagor in favor of Lender executed after this Security Instrument whether or not this Security Instrument is specifically referenced. If more than one person signs this Security Instrument, each Mortgagor agrees that this Security Instrument will secure all future advances and future obligations that are given to or incurred by any one or more Mortgagor, or any one or more Mortgagor and others. All future advances and other future obligations are secured by this Security Instrument even though all or part may not yet be advanced. All future advances and other future obligations are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment must be agreed to in a separate writing.

C. All obligations Mortgagor owes to Lender, which may later arise, to the extent not prohibited by law, including, but not limited to, liabilities for overdrafts relating to any deposit account agreement between Mortgagor and Lender.

D. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

This Security Instrument will not secure any other debt if Lender fails to give any required notice of the right of rescission.

4. **PAYMENTS.** Mortgagor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

5. **PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Mortgagor agrees:
   A. To make all payments when due and to perform or comply with all covenants.

   B. To promptly deliver to Lender any notices that Mortgagor receives from the holder.

   C. Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

6. **CLAIMS AGAINST TITLE.** Mortgagor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Mortgagor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Mortgagor's payment. Mortgagor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Mortgagor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Mortgagor may have against parties who supply labor or materials to maintain or improve the Property.

7. **DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable. This covenant shall run with the Property and shall remain in effect until the Secured Debt is paid in full and this Security Instrument is released.

8. **PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Mortgagor will keep the Property in good condition and make all repairs that are reasonably necessary. Mortgagor shall not commit or allow any waste, impairment, or deterioration of the Property. Mortgagor will keep the Property free of noxious weeds and grasses. Mortgagor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Mortgagor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Mortgagor will notify Lender of all demands, proceedings, claims and actions against Mortgagor, and of any loss or damage to the Property.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Mortgagor notice at the time of or before an inspection specifying a reasonable purpose for

the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Mortgagor will in no way rely on Lender's inspection.

9. **AUTHORITY TO PERFORM.** If Mortgagor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Mortgagor appoints Lender as attorney in fact to sign Mortgagor's name or pay any amount necessary for performance. Lender's right to perform for Mortgagor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

10. **ASSIGNMENT OF LEASES AND RENTS.** Mortgagor irrevocably grants, bargains, sells, conveys and warrants to Lender as additional security all the right, title and interest in and to any and all existing or future leases, subleases, and any other written or verbal agreements for the use and occupancy of any portion of the Property, including any extensions, renewals, modifications or substitutions of such agreements (all referred to as "Leases") and rents, issues and profits (all referred to as "Rents"). Mortgagor will promptly provide Lender with true and correct copies of all existing and future Leases. Mortgagor may collect, receive, enjoy and use the Rents so long as Mortgagor is not in default under the terms of this Security Instrument.

Mortgagor agrees that this assignment is immediately effective after default between the parties to this Security Instrument and effective as to third parties on the recording of the Security Instrument, and this assignment will remain effective during any period of redemption by the Mortgagor until the Secured Debt is satisfied. Mortgagor agrees that Lender may take actual possession of the property without the necessity of commencing legal action and that actual possession is deemed to occur when Lender, or its agent, notifies Mortgagor of default and demands that any tenant pay all future Rents directly to Lender. On receiving notice of default, Mortgagor will endorse and deliver to Lender any payment of Rents in Mortgagor's possession and will receive any Rents in trust for Lender and will not commingle the Rents with any other funds. Any amounts collected will be applied as provided in this Security Instrument. Mortgagor warrants that no default exists under the Leases or any applicable landlord/tenant law. Mortgagor also agrees to maintain and require any tenant to comply with the terms of the Leases and applicable law.

11. **LEASEHOLDS; CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** Mortgagor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the Property includes a unit in a condominium or a planned unit development, Mortgagor will perform all of Mortgagor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

12. **DEFAULT.** Mortgagor will be in default if any party obligated on the Secured Debt fails to make payment when due. Mortgagor will be in default if a breach occurs under the terms of this Security Instrument or any other document executed for the purpose of creating, securing or guarantying the Secured Debt. A good faith belief by Lender that Lender at any time is insecure with respect to any person or entity obligated on the Secured Debt or that the prospect of any payment or the value of the Property is impaired shall also constitute an event of default.

13. **REMEDIES ON DEFAULT.** In some instances, federal and state law will require Lender to provide Mortgagor with notice of the right to cure or other notices and may establish time schedules for foreclosure actions. Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Mortgagor is in default. Upon default, Lender shall have the right, without declaring the whole indebtedness due and payable, to foreclose against all or part of the Property. This Mortgage shall continue as a lien on any part of the Property not sold on foreclosure.

At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. In addition, Lender shall be entitled to all the remedies provided by law, the terms of the Secured Debt, this Security Instrument and any related documents. All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum

in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Mortgagor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

14. **EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** Except when prohibited by law, Mortgagor agrees to pay all of Lender's expenses if Mortgagor breaches any covenant in this Security Instrument. Mortgagor will also pay on demand any amount incurred by Lender for insuring, inspecting, preserving or otherwise protecting the Property and Lender's security interest. These expenses will bear interest from the date of the payment until paid in full at the highest interest rate in effect as provided in the terms of the Secured Debt. Mortgagor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lender's rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees, court costs, and other legal expenses. This Security Instrument shall remain in effect until released.

15. **ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), and all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste," "hazardous substance," or "regulated substance" under any Environmental Law.

Mortgagor represents, warrants and agrees that:

    A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance is or will be located, stored or released on or in the Property. This restriction does not apply to small quantities of Hazardous Substances that are generally recognized to be appropriate for the normal use and maintenance of the Property.

    B. Except as previously disclosed and acknowledged in writing to Lender, Mortgagor and every tenant have been, are, and shall remain in full compliance with any applicable Environmental Law.

    C. Mortgagor shall immediately notify Lender if a release or threatened release of a Hazardous Substance occurs on, under or about the Property or there is a violation of any Environmental Law concerning the Property. In such an event, Mortgagor shall take all necessary remedial action in accordance with any Environmental Law.

    D. Mortgagor shall immediately notify Lender in writing as soon as Mortgagor has reason to believe there is any pending or threatened investigation, claim, or proceeding relating to the release or threatened release of any Hazardous Substance or the violation of any Environmental Law.

16. **CONDEMNATION.** Mortgagor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Mortgagor authorizes Lender to intervene in Mortgagor's name in any of the above described actions or claims. Mortgagor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

17. **INSURANCE.** Mortgagor shall keep Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Mortgagor subject to Lender's approval, which shall not be unreasonably withheld. If Mortgagor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "loss payee clause." Mortgagor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Mortgagor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Mortgagor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Mortgagor.

Unless otherwise agreed in writing, all insurance proceeds shall be applied to the restoration or repair of the Property or to the Secured Debt, whether or not then due, at Lender's option. Any application of proceeds to principal shall not extend or postpone the due date of the scheduled payment nor change the amount of any payment. Any excess will be paid to the Mortgagor. If the Property is acquired by Lender, Mortgagor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

18. **ESCROW FOR TAXES AND INSURANCE.** If otherwise provided in a separate agreement, Mortgagor may be required to pay to Lender funds for taxes and insurance in escrow.

19. **FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Mortgagor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary. Mortgagor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Mortgagor's obligations under this Security Instrument and Lender's lien status on the Property.

20. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Security Instrument are joint and individual. If Mortgagor signs this Security Instrument but does not sign an evidence of debt, Mortgagor does so only to mortgage Mortgagor's interest in the Property to secure payment of the Secured Debt and Mortgagor does not agree to be personally liable on the Secured Debt. If this Security Instrument secures a guaranty between Lender and Mortgagor, Mortgagor agrees to waive any rights that may prevent Lender from bringing any action or claim against Mortgagor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws. Mortgagor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Mortgagor's consent. Such a change will not release Mortgagor from the terms of this Security Instrument. The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Mortgagor and Lender.

21. **APPLICABLE LAW; SEVERABILITY; INTERPRETATION.** This Security Instrument is governed by the laws of the jurisdiction in which Lender is located, except to the extent otherwise required by the laws of the jurisdiction where the Property is located. This Security Instrument is complete and fully integrated. This Security Instrument may not be amended or modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security Instrument. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Security Instrument are for convenience only and are not to be used to interpret or define the terms of this Security Instrument. Time is of the essence in this Security Instrument.

22. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or to any other address designated in writing. Notice to one mortgagor will be deemed to be notice to all mortgagors.

23. **WAIVERS.** Except to the extent prohibited by law, Mortgagor waives all appraisement and homestead exemption rights relating to the Property.

**24. MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall not exceed $ ......15,000.00...................... . This limitation of amount does not include interest, attorneys fees, and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

**25. OTHER TERMS.** If checked, the following are applicable to this Security Instrument:

☐ **Line of Credit.** The Secured Debt includes a revolving line of credit provision. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released.

☐ **Construction Loan.** This Security Instrument secures an obligation incurred for the construction of an improvement on the Property.

☐ **Fixture Filing.** Mortgagor grants to Lender a security interest in all goods that Mortgagor owns now or in the future and that are or will become fixtures related to the Property. This Security Instrument suffices as a financing statement and any carbon, photographic or other reproduction may be filed of record for purposes of Article 9 of the Uniform Commercial Code.

☐ **Riders.** The covenants and agreements of each of the riders checked below are incorporated into and supplement and amend the terms of this Security Instrument. [Check all applicable boxes]
   ☐ Condominium Rider  ☐ Planned Unit Development Rider  ☐ Other ................................................

☐ **Additional Terms.**

**SIGNATURES:** By signing below, Mortgagor agrees to the terms and covenants contained in this Security Instrument and in any attachments. Mortgagor also acknowledges receipt of a copy of this Security Instrument on the date stated on page 1.

☐ If checked, refer to the attached Addendum incorporated herein, for additional Mortgagors, their signatures and acknowledgments.

.......*Lee D West*............ 9-15-06     .......*Lynn M West* 9-15-06
(Signature) LEE D. WEST         (Date)   (Signature)  LYNN M. WEST      (Date)

**ACKNOWLEDGMENT:**
(Individual) STATE OF ......ILLINOIS................, COUNTY OF ......DuPage............ } ss.
This instrument was acknowledged before me this ....15t.... day of ......September. 2006......
by ....Lee D. West  Lynn M. West......
My commission expires:
(Seal)                                        .......*Brittin Dawson*.......
                                             (Notary Public)

```
        OFFICIAL SEAL
        BRITTIN DAWSON
    NOTARY PUBLIC - STATE OF ILLINOIS
    MY COMMISSION EXPIRES 08/21/09
```

# EXHIBIT M

OMB NO. 2502-0265

| A. | | | 6. TYPE OF LOAN: | |
|---|---|---|---|---|
| U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT | | | 1. ☐ FHA  2. ☐ FmHA  3. ☒ CONV. UNINS.  4. ☐ VA  5. ☐ CONV. INS. | |
| **SETTLEMENT STATEMENT** | | 6. FILE NUMBER: 2006-03485-1-PT | 7. LOAN NUMBER: 047-D59235-3 | |
| | | 8. MORTGAGE INS CASE NUMBER: | | |

C. NOTE: *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(POC)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.* 1d. 338 (2006-03485-1-PT) PB1(2006-03485-1-PT01)

| D. NAME AND ADDRESS OF BORROWER: | E. NAME AND ADDRESS OF SELLER: | F. NAME AND ADDRESS OF LENDER: |
|---|---|---|
| LEE D. WEST and LYNN M. WEST 708 OAKWOOD DRIVE WESTMONT, Il 60559 | | HOMECOMINGS FINANCIAL 9 Sylvan Way Suite 100 Parsippany, NJ 07054 |

| G. PROPERTY LOCATION: 708 OAKWOOD DRIVE WESTMONT, IL 60559 DuPage - 2nd County, Illinois LOT 100 OAKWOOD UNIT ONE 09-03-202-019-0000 | H. SETTLEMENT AGENT: Premier Title PLACE OF SETTLEMENT 1000 Jorie Blvd. Suite 136 Oak Brook, IL 60529 | I. SETTLEMENT DATE: September 15, 2006 Disburse:09/20/06 |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract Sales Price | | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to Borrower (Line 1400) | 1,352.06 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| *Adjustments For Items Paid By Seller in advance* | | *Adjustments For Items Paid By Seller in advance* | |
| 106. City/Town Taxes to | | 406. City/Town Taxes to | |
| 107. County Taxes to | | 407. County Taxes to | |
| 108. County Taxes to | | 408. County Taxes to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 1,352.06 | **420. GROSS AMOUNT DUE TO SELLER** | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | | 501. Excess Deposit (See Instructions) | |
| 202. Principal Amount of New Loan(s) | 15,000.00 | 502. Settlement Charges to Seller (Line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff First Mortgage | |
| 205. | | 505. Payoff Second Mortgage | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments For Items Unpaid By Seller* | | *Adjustments For Items Unpaid By Seller* | |
| 210. City/Town Taxes to | | 510. City/Town Taxes to | |
| 211. County Taxes to | | 511. County Taxes to | |
| 212. County Taxes to | | 512. County Taxes to | |
| 213. Assessments | | 513. Assessments | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 15,000.00 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross Amount Due From Borrower (Line 120) | 1,352.06 | 601. Gross Amount Due To Seller (Line 420) | |
| 302. Less Amount Paid By/For Borrower (Line 220) | ( 15,000.00) | 602. Less Reductions Due Seller (Line 520) | ( ) |
| **303. CASH ( FROM ) ( X TO ) BORROWER** | 13,647.94 | **603. CASH ( TO ) ( FROM ) SELLER** | 0.00 |

| | | | | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|---|---|
| **700. TOTAL COMMISSION Based on Price** | $ | @ | % = | | | |
| Division of Commission (line 700) as follows: | | | | | | |
| 701. $ | to | | | | | |
| 702. $ | to | | | | | |
| 703. Commission Paid at Settlement | | | | | | |
| 704. | to | | | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | | | | |
| 801. Loan Origination Fee | % | to | | | | |
| 802. Loan Discount | % | to | | | | |
| 803. Appraisal Fee | | to | | | | |
| 804. Credit Report | | to | | | | |
| 805. Commitment Fee | | to | | | | |
| 806. Funding Fee | | to North American Settlement | | | | 250.00 | |
| 807. Underwriting Fee | | to | | | | |
| 808. | | | | | | |
| 809. Yield Spread Premium | | | | | | |
| 810. Flood Certification | | | | | | |
| 811. Lender Loan Charge | | to HOMECOMINGS FINANCIAL | | | | 315.00 | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | | | | |
| 901. Interest From 09/20/06 to 10/01/06 @ $ 3.914300/day ( 11 days %) | | | | | 43.06 | |
| 902. Mortgage Insurance Premium for 12 months to | | | | | | |
| 903. Hazard Insurance Premium for 1.0 years to | | | | | | |
| 904. | | | | | | |
| 905. | | | | | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | | | | | |
| 1001. Hazard Insurance | | months @ $ | per month | | | |
| 1002. Mortgage Insurance | | months @ $ | per month | | | |
| 1003. City/Town Taxes | | months @ $ | per month | | | |
| 1004. County Taxes | | months @ $ | per month | | | |
| 1005. County Taxes | | months @ $ | per month | | | |
| 1006. | | months @ $ | per month | | | |
| 1007. | | months @ $ | per month | | | |
| 1008. Aggregate Adjustment | | months @ $ | per month | | | |
| **1100. TITLE CHARGES** | | | | | | |
| 1101. Settlement/Closing Fee | | to Premier Title | | | | 259.00 | |
| 1102. Update Fee | | to Premier Title | | | | |
| 1103. DFI Fee | | to Premier Title Reserve Account | | | | 3.00 | |
| 1104. Wire Transfer Fee | | to Premier Title | | | | |
| 1105. Document Preparation | | to Premier Title | | | | |
| 1106. Attorney's Fees - Buyer | | to | | | | |
| 1107. EPL Endorsement | | to Premier Title | | | | 125.00 | |
| (includes above item numbers: | | | | | ) | |
| 1108. Title Insurance | | to Premier Title | | | | 315.00 | |
| (includes above item numbers: | | | | | ) | |
| 1109. Lender's Coverage | | $ 15,000.00 | | 315.00 | | |
| 1110. Owner's Coverage | | $ | | | | |
| 1111. | | Premier Title | | | | |
| 1112. | | Premier Title | | | | |
| 1113. | | Premier Title | | | | |
| 1114. | | Premier Title | | | | |
| 1115. | | Premier Title | | | | |
| 1116. Collateral Services - Buyer | | Premier Title | | | | |
| 1117. Collateral Services - Seller | | Premier Title | | | | |
| 1118. | | Premier Title | | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | | | | |
| 1201. Recording Fees: Deed $ | ; Mortgage $ 51.00; | Releases $ | | | 51.00 | |
| 1202. City/County Tax/Stamps: Deed | ; Mortgage | | | | | |
| 1203. State Tax/Stamps: Deed | ; Mortgage | | | | | |
| 1204. | | Chicago Title Company | | | | |
| 1205. | | Chicago Title Company | | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | | | | |
| 1301. Survey | | to | | | | |
| 1302. Pest Inspection | | to | | | | |
| 1303. Title Indemnity | | | | | | |
| 1304. Title Indemnity Fee | | | | | | |
| 1305. | | | | | | |
| **1400. TOTAL SETTLEMENT CHARGES (Enter on Lines 103, Section J and 502, Section K)** | | | | | | 1,352.06 | |

Certified to be a true copy.

# EXHIBIT N

OMB NO. 2502-0265

**A.**

**U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT**

**SETTLEMENT STATEMENT**

| B. TYPE OF LOAN: | | | |
|---|---|---|---|
| 1. ☐ FHA | 2. ☐ FmHA | 3. ☒ CONV. UNINS. | 4. ☐ VA | 5. ☐ CONV. INS. |

**6. FILE NUMBER:**
2008-03482-1-PT

**7. LOAN NUMBER:**
047-059235-3

**8. MORTGAGE INS CASE NUMBER:**

**C. NOTE:** *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(POC)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.*

1-6 3/88   (2008-03482-1-PT/FFD/2008-03482-1-PT/6)

| D. NAME AND ADDRESS OF BORROWER: | E. NAME AND ADDRESS OF SELLER: | F. NAME AND ADDRESS OF LENDER: |
|---|---|---|
| LEE D. WEST and<br>LYNN M. WEST<br>708 OAKWOOD DRIVE<br>WESTMONT, IL 60559 | | HOMECOMINGS FINANCIAL<br>8 Sylvan Way Suite 100<br>Parsippany, NJ 07054 |

| G. PROPERTY LOCATION:<br>708 OAKWOOD DRIVE<br>WESTMONT, IL 60559<br>DuPage - 2nd County, Illinois<br>LOT 100<br>OAKWOOD UNIT ONE<br>09-03-202-019-0000 | H. SETTLEMENT AGENT:<br>Premier Title<br><br>PLACE OF SETTLEMENT<br>1000 Jorie Blvd. Suite 136<br>Oak Brook, IL 60523 | I. SETTLEMENT DATE:<br><br>September 15, 2008<br><br>Disburse:09/20/08 |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract Sales Price | | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to Borrower (Line 1400) | 1,102.06 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| *Adjustments For Items Paid By Seller in advance* | | *Adjustments For Items Paid By Seller in advance* | |
| 106. City/Town Taxes          to | | 406. City/Town Taxes          to | |
| 107. County Taxes          to | | 407. County Taxes          to | |
| 108. County Taxes          to | | 408. County Taxes          to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMOUNT DUE FROM BORROWER** | 1,102.06 | **420. GROSS AMOUNT DUE TO SELLER** | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | | 501. Excess Deposit (See Instructions) | |
| 202. Principal Amount of New Loan(s) | 15,000.00 | 502. Settlement Charges to Seller (Line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff First Mortgage | |
| 205. | | 505. Payoff Second Mortgage | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| *Adjustments For Items Unpaid By Seller* | | *Adjustments For Items Unpaid By Seller* | |
| 210. City/Town Taxes          to | | 510. City/Town Taxes          to | |
| 211. County Taxes          to | | 511. County Taxes          to | |
| 212. County Taxes          to | | 512. County Taxes          to | |
| 213. Assessments | | 513. Assessments | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 15,000.00 | **520. TOTAL REDUCTION AMOUNT DUE SELLER** | |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross Amount Due From Borrower (Line 120) | 1,102.06 | 601. Gross Amount Due To Seller (Line 420) | |
| 302. Less Amount Paid By/For Borrower (Line 220) | (15,000.00) | 602. Less Reductions Due Seller (Line 520) | ( |
| **303. CASH ( FROM ) ( X TO ) BORROWER** | 13,897.94 | **603. CASH ( TO ) ( FROM ) SELLER** | 0.00 |

## L. SETTLEMENT CHARGES

| 700. TOTAL COMMISSION Based on Price | $ | @ | % | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|---|---|
| Division of Commission (line 700) as Follows: | | | | | |
| 701. $ | to | | | | |
| 702. $ | to | | | | |
| 703. Commission Paid at Settlement | | | | | |
| 704. | to | | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | | | |
| 801. Loan Origination Fee | % | to | | | |
| 802. Loan Discount | % | to | | | |
| 803. Appraisal Fee | to | | | | |
| 804. Credit Report | to | | | | |
| 805. Commitment Fee | to | | | | |
| 806. Tax Service Fee | to | | | | |
| 807. Underwriting Fee | to | | | | |
| 808. | | | | | |
| 809. Yield Spread Premium | | | | | |
| 810. Flood Certification | | | | | |
| 811. Lender Loan Charge | to HOMECOMINGS FINANCIAL | | | 315.00 | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | | | |
| 901. Interest From 09/20/06 to 10/01/06 @ $ 3.914300/day ( 11 days %) | | | | 43.06 | |
| 902. Mortgage Insurance Premium for 12 months to | | | | | |
| 903. Hazard Insurance Premium for 1.0 years to | | | | | |
| 904. | | | | | |
| 905. | | | | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | | | | |
| 1001. Hazard Insurance | months @ $ | per month | | | |
| 1002. Mortgage Insurance | months @ $ | per month | | | |
| 1003. City/Town Taxes | months @ $ | per month | | | |
| 1004. County Taxes | months @ $ | per month | | | |
| 1005. County Taxes | months @ $ | per month | | | |
| 1006. | months @ $ | per month | | | |
| 1007. | months @ $ | per month | | | |
| 1008. Aggregate Adjustment | months @ $ | per month | | | |
| **1100. TITLE CHARGES** | | | | | |
| 1101. Settlement/Closing Fee | to Premier Title | | | 250.00 | |
| 1102. Update Fee | to Premier Title | | | | |
| 1103. DFI Fee | to Premier Title Reserve Account | | | 3.00 | |
| 1104. Wire Transfer Fee | to Premier Title | | | | |
| 1105. Document Preparation | to Premier Title | | | | |
| 1106. Attorney's Fees - Buyer | to | | | | |
| 1107. EPL Endorsement | to Premier Title | | | 125.00 | |
| (includes above item numbers: ) | | | | | |
| 1108. Title Insurance | to Premier Title | | | 315.00 | |
| (includes above item numbers: ) | | | | | |
| 1109. Lender's Coverage | $ 15,000.00 | 315.00 | | | |
| 1110. Owner's Coverage | $ | | | | |
| 1111. | Premier Title | | | | |
| 1112. | Premier Title | | | | |
| 1113. | Premier Title | | | | |
| 1114. | Premier Title | | | | |
| 1115. | Premier Title | | | | |
| 1116. Collateral Services - Buyer | Premier Title | | | | |
| 1117. Collateral Services - Seller | Premier Title | | | | |
| 1118. | Premier Title | | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | | | |
| 1201. Recording Fees: Deed $ ; Mortgage $ 51.00 ; Releases $ | | | | 51.00 | |
| 1202. City/County Tax/Stamps: Deed ; Mortgage | | | | | |
| 1203. State Tax/Stamps: Deed ; Mortgage | | | | | |
| 1204. | Chicago Title Company | | | | |
| 1205. | Chicago Title Company | | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | | | |
| 1301. Survey | to | | | | |
| 1302. Pest Inspection | to | | | | |
| 1303. Title Indemnity | | | | | |
| 1304. Title Indemnity Fee | | | | | |
| 1305. | | | | | |
| **1400. TOTAL SETTLEMENT CHARGES (Enter on Lines 103, Section J and 502, Section K)** | | | | 1,102.06 | |

Certified to be a true copy.

# EXHIBIT O

# FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT

Borrower:

LEE D. WEST
708 OAKWOOD DR
WESTMONT, IL 60559

Creditor:

HOMECOMINGS FINANCIAL NETWORK, INC.
9 SYLVAN WAY, SUITE 100
PARSIPPANY, NJ 07054

Loan Number:  047-059235-3

Date:  09/15/2006

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of payments |
|---|---|---|---|
| The cost of your credit as a yearly rate | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 10.2069% | $30,583.25 | $14,256.94 | $34,840.19 |

Your payment schedule will be:

| No. of Pmts | Amt. of Pmts | Monthly Pmts Begin | No. of Pmts | Amt. of Pmts | Monthly Pmts Begin | No. of Pmts | Amt. of Pmts | Monthly Pmts Begin |
|---|---|---|---|---|---|---|---|---|
| 179 | 126.40 | 11/01/2006 | | | | | | |
| 1 | 12214.59 | 10/01/2021 | | | | | | |

**INSURANCE:** The following insurance is required to obtain credit:  * Property
You may obtain the insurance from anyone that is acceptable to creditor.

**SECURITY:**  You are giving a security interest in real property you already own.
Property Address: 708 OAKWOOD DR, WESTMONT, IL  60559

**LATE CHARGE:**  If a payment is more than 15 days late, you will be charged 5 % of the
overdue payment of principal and interest.

**PREPAYMENT:**  If you pay off your loan early,   * You will not have to pay a penalty.
* You will not be entitled to a refund of part of the finance charge.

**ASSUMPTION:**  Someone buying your property cannot assume the remainder of your loan on the
original terms.

**See** your contract documents for any additional information about nonpayment, default, any
required repayment in full before the scheduled date, and prepayment refunds and penalties.

| _Lee D. West_ | _9-15-06_ | _Lynn West_ | _9-15-06_ |
|---|---|---|---|
| LEE D. WEST | DATE | LYNN M. WEST | DATE |

# EXHIBIT P

**NOTICE OF RIGHT TO CANCEL**

LENDER:   HOMECOMINGS FINANCIAL NETWORK, INC.
          9 SYLVAN WAY, SUITE 100
          PARSIPPANY, NJ 07054

DATE: 09/15/2006
LOAN NO.: 047-069236-9
TYPE: SEC:20/15

BORROWERS:   LEE D. WEST                          LYNN M. WEST

ADDRESS:      708 OAKWOOD DR
CITY/STATE/ZIP:   WESTMONT, IL 60559
PROPERTY:

You are entering into a transaction that will result in a mortgage on your home. You have a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from whichever of the following events occurs last:

(1)   The date of the transaction, which is  SEPTEMBER 15TH, 2006          ; or
(2)   The date you received your Truth in Lending disclosures; or
(3)   The date you received this notice of your right to cancel.

If you cancel the transaction, the mortgage is also cancelled. Within 20 CALENDAR DAYS after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage on your home has been cancelled, and we must return to you any money or property you have given us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home-or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 CALENDAR DAYS of your offer, you may keep it without further obligation.

---

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing at:

    HOMECOMINGS FINANCIAL NETWORK, INC.
    9 Sylvan Way, Suite 310
    Parsippany, NJ 07054
    FAX: (973) 325-1900

You may use any written statement that is signed and dated by you and states your intention to cancel and/or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than MIDNIGHT of  SEPTEMBER 19TH, 2006          (or MIDNIGHT of the THIRD BUSINESS DAY following the latest of the three events listed above.) If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

_____          _____
SIGNATURE                                           DATE

---

The undersigned each acknowledge receipt of two copies of NOTICE of RIGHT TO CANCEL and one copy of the Federal Truth in Lending Disclosure Statement, all given by lender in compliance with Truth in Lending Simplification and Reform Act of 1980 (Public Law 96-221).

Each borrower in this transaction has the right to cancel. The exercise of this right by one borrower shall be effective to all borrowers.

| _Lee D. West_ | 9-15-06 | _Lynn M. West_ | 9-15-06 |
|---|---|---|---|
| LEE D. WEST | Date | LYNN M. WEST | Date |
| | Date | | Date |
| | Date | | Date |
| | Date | | Date |
| | Date | | Date |
| | Date | | Date |

MFCD8714 - 09/04                                                              047-069236-9

# EXHIBIT Q

**LAW OFFICES OF AL HOFELD, JR., LLC**
208 S. LaSalle Street, Suite #1650
Chicago, Illinois 60604
Phone - 312-345-1004
Fax - 312-346-3242 (FAX)
Email: al@alhofeldlaw.com

April 10, 2008

**BY HAND DELIVERY:**

Mortgage Electronic Information Systems, Inc.
C/o registered agent,
CT Corporation System
208 South LaSalle Street
Chicago, IL 60604

**BY REGULAR U.S. MAIL:**

Homecomings Financial, LLC
formerly Homecomings Financial Network, Inc.,
8400 Normandale Lake Boulevard, Suite #250
Minneapolis, MN 55437

Aurora Loan Services, LLC
10350 Park Meadows Drive,
Littleton, CO 80124

Bank of America Corporate Affairs
100 North Tryon Street
Mail Code NC1-007-18-01

Bank of America
PO Box 21848
Greensboro, NC 27420-1848

Re:    Notice of TLA rescission, claim and lien for Lee and Lynn West,
       708 Oakwood Drive, Westmont, IL 60559; loans of September 15,
       2006, originated by Homecomings Financial Network, Inc.

Ladies/Gentlemen:

        The above clients hereby give notice that they rescind the above loans for
noncompliance with the Truth in Lending Act.

1

Please be further advised that we have been retained by the above client to file suit against you and that we claim a lien upon said recovery for 1/3 or such amount as a court awards.

If you claim that the owner of the loan is other than yourself, please identify the owner pursuant to your obligation under 15 U.S.C. §1641(f)(2).

Finally, please provide a complete account history for each loan so that we may compute the appropriate tender amount.

Sincerely,

Al Hofeld, Jr.

Cc:     clients

2

I, Al Hofeld, Jr., under penalty of perjury, as provided for by 28 U.S.C. §1746, certify that I had a copy of the foregoing document delivered/sent to the listed addressees on April 10, 2008.

Al Hofeld, Jr.

3